UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————————x

G.R., as Parent and Natural Guardian
o/b/o R.R., an Infant,

                Plaintiff,                    No. 07 Civ. 4711 (TPG)

        -against-

NEW YORK CITY DEPARTMENT
OF EDUCATION,

                Defendant.
————————————————————————————x


## PLAINTIFF'S EXHIBITS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT


                PARTNERSHIP FOR CHILDREN'S RIGHTS
                WARREN J. SINSHEIMER (WS 9906)
                MICHAEL D. HAMPDEN (MH 2359),
                    of Counsel
                Attorneys for Plaintiff
                271 Madison Avenue, 17th Floor
                New York, NY 10016
                (212) 683-7999, ext. 222

## PLAINTIFF'S EXHIBIT LIST

### 10/4/06 Impartial Hearing Pleadings, Transcript, and Decision

| EXH. | DATE | TITLE OF DOCUMENT | PAGES |
|---|---|---|---|
| A | 8/18/06 | Parent's Impartial Hearing Request | 2 |
| B | 10/4/06 | Impartial Hearing Transcript | 28 |
| C | 10/16/06[1] | Parent's Post Hearing Memorandum of Law | 8 |
| D | 10/23/06 | Impartial Hearing Officer's Findings of Fact and Decision | 11 |

### Documents Admitted Into Evidence at the 10/4/06 Impartial Hearing

| EXH. | DATE | TITLE OF DOCUMENT | PAGES |
|---|---|---|---|
| E | 10/7/05 | Individualized Education Program | 13 |
| F | 9/26/02 | Educational Evaluation | 2 |
| G | 9/19/05 | Comprehensive Psychoeducational Evaluation | 4 |
| H | 9/26/06 | Enrollment Agreement 2006-2007 for Winston Preparatory School | 1 |
| I | 8/17/06 | Letter from Warren Sinsheimer to Region 2 | 1 |
| J | 4/12/06 | U.S. Individual Income Tax Return 2005 | 5 |
| K | 5/05 (last refreshed) | Internet Document from New York City Department of Education Website Regarding Expenditures for P.S. 111 Seton Falls for the 2003-2004 School Year | 1 |

### State Review Office (SRO) Pleadings and Decision

| EXH. | DATE | TITLE OF DOCUMENT | PAGES |
|---|---|---|---|
| L | 11/27/06 | New York City Department of Education (DOE) Notice with Petition and Verified Petition to SRO (with exhibits) | 23 |
| M | 12/27/06 | Parent's Verified Answer and Cross-Appeal (with exhibit) | 16 |
| N | 1/12/07 | DOE's Verified Answer to Cross Appeal | 11 |
| O | 2/9/07 | SRO Decision | 6 |

### Additional Evidence
### 12/22/06 Impartial Hearing Record

| EXH. | DATE | TITLE OF DOCUMENT | PAGES |
|---|---|---|---|
| P | 10/27/06 | Parent's Impartial Hearing Request | 2 |
| Q | 11/17/06 | DOE's Motion to Dismiss | 8 |

---

[1] The Parent's Post Hearing Memorandum of Law is incorrectly dated September 19, 2006 on page 7 of the document. The fax cover sheet sent with the document to the Impartial Hearing Officer lists the correct date— October 16, 2006.

| R | 12/4/06 | Parent's Answer to Motion to Dismiss | 8 |
| S | 12/22/06 | Impartial Hearing Transcript | 8 |
| T | 2/15/07 | Impartial Hearing Officer's Findings of Fact and Decision | 4 |

**Additional Evidence**
**Student Evaluations, Reports, and School Records**

| EXH. | DATE | TITLE OF DOCUMENT | PAGES |
|------|------|------------------|-------|
| U | 3/21/07 | DOE Comprehensive Psychological & Educational Evaluation | 28 |
| V | Fall 2006 | Winston Preparatory School Fall 2006 Report | 6 |
| W | Winter 2007 | Winston Preparatory School Winter Progress Report 2007 | 5 |
| X | Spring 2007 | Winston Preparatory School Spring Progress Report 2007 | 5 |
| Y | 6/1/07 | Winston Preparatory School Letter to Parents and Standardized Testing Score Reports | 8 |
| Z | Academic Year 2006–2007 | Winston Preparatory School Report Card 2006–2007 | 1 |
| AA | 10/24/07 | Letter from Scott Bezylko to Gloria Rodriguez | 1 |
| BB | 11/28/07 | Winston Preparatory School MS 1 Class 2006-2007 Group Profile: Pervasive, Language Based | 2 |

# EXHIBIT A

08-18-'06 11:21 FROM-                                      T-286 P001    F-997   Mex



## LEGAL
## SERVICES FOR
## CHILDREN, INC.

*106010*

<u>VIA FACSIMILE</u>

August 18, 2006

Impartial Hearing Office
NYC Dept. of Education
131 Livingston Street
Brooklyn, New York 11201

      Re:   Robert Rios
            679 Waring Avenue Apt. 4H
            Bronx, NY 10467

            NYC ID# 268-366-903
            Region 2, District 11

## <u>NOTICE OF APPEARANCE AND REQUEST FOR IMPARTIAL HEARING</u>

Ladies and Gentlemen:

      Please be advised that Gloria Rodriguez has retained me on behalf of her son, Robert Rios, to represent them at an impartial hearing. Please address all future correspondence to my attention.

### <u>Impartial Hearing</u>

      *Issue*: The child, Robert Rios, has not been offered a FAPE for the 2006-2007 school year. The DOE's last IEP was issued on October 27, 2005. This IEP was defective in that legally required participants were not present at the CSE conference where the IEP was created. The October 27, 2005 IEP has classified Robert as Speech/Language Impaired. This is a change from his previous classification of Emotionally Disturbed, but there is no record of an evaluation being made as the basis for this change. The most recent IEP also incorrectly lists Robert as being in the fourth grade. Most important, Robert's minimal progress in his special education class demonstrates that his current placement is inappropriate.

      Robert has been accepted at Winston Preparatory School, a private, special education school in Manhattan for the 2006-2007 school year. Winston Prep offers a

271 MADISON AVENUE   17TH FLOOR · NEW YORK, NEW YORK 10016
212.683.7999 · FAX 212.683.5544 · EMAIL lsc@kidslaw.org

AUG-18-2006  12:42                              97x                  P.01

03-18-'06 11:21 FROM-                                    T-186  P002   F-557

structured program in a supportive setting that would be appropriate for a student with Robert's disability.

*Relief requested:*  An order directing the Department of Education to pay the tuition for Winston Preparatory School for the 2006-2007 school year

## Resolution Meeting

As this is a request for private school tuition payment and the Department will not have anyone present at the meeting who can bind the Comptroller of the City of New York who must agree to such payment, the Parent waives the Resolution Meeting and requests an immediate Impartial Hearing within the time limits established by the Regulations. In the event that a Resolution Meeting is required despite the Parent's wavier and failure of the Department to have a person present who can agree to the prepayment of tuition, please contact me.

I can be reached at (212) 683-7999, extension 222 to schedule the hearing.

Yours truly,

Warren Sinsheimer, Esq.

        cc:    CSE Region 2

2

# EXHIBIT B

INDEX

| WITNESS | DIRECT | CROSS | RE DIRECT | RE CROSS | I.D. | V. D. | IN EV. |
|---------|--------|-------|-----------|----------|------|-------|--------|
| G. Rodriguez | 7 | 16 | | | 6 | | 7 |
| | | | | | 6 | | 7 |
| B. Sugarman | 33 | 39 | | | 6 | | 7 |
| | | | | | 6 | | 7 |
| M. Parent | 51 | 52 | | | 6 | | 7 |
| | | | | | 6 | | 7 |
| | | | | | 7 | | 7 |

EXHIBITS

| PARENT | DESCRIPTION | I.D. | IN EV. |
|--------|-------------|------|--------|
| 1 | IEP dated 10/7/05, 14 pages | 6 | 7 |
| 2 | Education Evaluation dated 9/26/02, 6 pages | 6 | 7 |
| 3 | Psycho-educational Evaluation dated 9/19/05, 4 pages. | 6 | 7 |
| 4 | Enrollment agreement from Winston Preparatory School, 1 page. | 6 | 7 |
| 5 | Letter to Region 2, withdrawing Robert from Public School System dated August 17, 2006, 1 page. | 6 | 7 |
| 6 | Federal Tax Return 2005, 1 page. | 6 | 7 |
| 7 | New York City Department of Education's Expenditures Sheet, P.S. 111 Student Goals, from 2003-2004 | 7 | 7 |

DEPARTMENT OF EDUCATION DESCRIPTION

DEPARTMENT OF EDUCATION
OF the
CITY OF NEW YORK

------------------

In the Matter of:

ROBERT RIOS                    Case No.: 106010

------------------X

District #11

Wednesday
October 4, 2006

The above-entitled matter came on for hearing
at 10:00 a.m.

BEFORE:    JUDITH T. KRAMER,
           Impartial Hearing Officer

A P P E A R A N C E S:

For the Student:

WARREN J. SINSHERMAN Attorney
GLORIA RODRIGUEZ, Parent
BETH SUGARMAN, Director of Operations, Winston Prep.

For the Department of Education:

MARX PARENT, CSE Region 2 Representative

3

1           P R O C E E D I N G S
2           HEARING OFFICER KRAMER: Okay, good
3  morning. My name is Judith Kramer, I've been
4  appointed to preside over this hearing that was
5  filed by the parent, Ms. Gloria Rodriguez Donne
6  (phonetic) on behalf of her child, case number
7  106010. Today is September 4; I mean, I'm sorry,
8  October 4th, 2006. And it is four minutes after
9  10:00. I have disclosed, or I have been asked
10 the parties, whom I believe I've met before,
11 whether or not they have any objection to me
12 presiding over this hearing. I will disclose to
13 them in case they've forgotten, that I am an
14 attorney, I've practiced in New York State for
15 thirty-five plus years. My husband is currently
16 a teacher at the Board of Education, but I have
17 no interest in the outcome of this case and he
18 does not interfere with any of my decision-
19 making. And also I currently practice law in a
20 small, law firm in Brooklyn as an advocate for
21 children. So, when I'm not doing this. So if no
22 one has any objections? I will preside over
23 this. Okay. Now we're going to go around the
24 room and introduce ourselves and identify
25 ourselves by title or status.

4

1           MS. GLORIA RODRIGUEZ: My name is Gloria
2  Rodriguez and I'm Robert Rios's mother.
3           MR. WARREN SINSHERMER: Warren
4  Sinshermer, Legal Services for Children,
5  representing the child.
6           MR. MARK PARENT: Mark Parent, CSE
7  Region 2 Representative.
8           HEARING OFFICER KRAMER: Thank you.
9  Before we begin I just want to clarify that the
10 issue before me today is tuition reimbursement
11 for the child who's been placed in a non-approved
12 private school and that there's been a
13 stipulation as to Prong One, (phonetic) under
14 Carter, that; and I suppose that stipulation
15 would read that the Board is conceding that it
16 did not provide a FAPE for the child?
17           MR. PARENT: Correct.
18           HEARING OFFICER KRAMER: For the 2005-
19           MR. PARENT: (Interposing) 06-2007
20 school year.
21           HEARING OFFICER KRAMER: So this current
22 school year. Alright. And so now we're going to
23 listen to evidence with respect to Prongs 2, 3
24 and financial needs with respect to the Connors
25 (phonetic) requirement. Is that correct? That's

5

1   what we're doing. Okay. We're ready to begin.
2   Before we go on the record, however, I just want
3   to make sure that we have all the evidentiary
4   material that's been offered, so I'm going to put
5   that on the record as well. The parents have
6   offered eight exhibits and the district has
7   stated that it is not planning to offer any
8   because all of those exhibits include documents
9   that they would have offered themselves. So
10  there's no objection to any of these exhibits
11  coming in. Is that correct, Mr. Parent?
12      MR. PARENT: Correct. Although I will
13  have a comment about the new exhibit that Mr.
14  Sinsheimer submitted.
15      HEARING OFFICER KRAMER: Would you like
16  to tell me what that comment is before I rule on
17  it?
18      MR. PARENT: Okay. In terms of a circle
19  figure, total student spend—
20      HEARING OFFICER KRAMER: (Interposing)
21  Let's not go into the merits of the document.
22  Just tell me if you have an objection.
23      MR. PARENT: No, I don't have any
24  objection.
25      HEARING OFFICER KRAMER: Okay. You can—

6

1       MR. PARENT: (Interposing) Just as long
2   as I can comment on it.
3       HEARING OFFICER KRAMER: You'll be able
4   to do that later, if it's in evidence. So you
5   have no problem putting it into evidence?
6       MR. PARENT: Right.
7       HEARING OFFICER KRAMER: That's going to
8   be marked Parent's Exhibit 8. So Parent's
9   Exhibit 1 is an IEP dated 10/7/05, which is
10  fourteen pages. Parent's Exhibit 2 is an
11  Education Evaluation dated 9/26/02, which is six
12  pages; Parent's 3 is a Psycho-educational
13  Evaluation dated 9/19/05, which is four pages;
14  Parent's Exhibit 4 is an enrollment agreement
15  from Winston Preparatory school which is one
16  page. Parent's Exhibit 5 is a letter; did I say
17  that, did I say Parent's Exhibit 4 was an
18  Enrollment Agreement? I did. Parent's Exhibit 5
19  is a letter to Region 2, withdrawing Robert from
20  Public School System dated August 17, 2006, which
21  is one page. Parent's Exhibit 6 is a tax return
22  for the year 2005, which is five pages, Federal
23  tax return. Parent's Exhibit 7 is, reserves the
24  right for the Parent to offer any other document
25  not listed above, prepared by the Board of

7

1 Education and so, Parent's Exhibit 7 will now be

2 the New York City Department of Education's

3 Expenditures sheet from the internet titled P.S.

4 111 Student Goals, and it appears to be a chart

5 of expenditures per student for; based on data

6 from 2003-2004. -- And all of those will be

7 received into evidence.

8     (Whereupon Parents Exhibits 1-7 were

9 admitted into evidence.)

10     HEARING OFFICER KRAMER: Now we're ready

11 to begin. And you have -- we'll begin. Ms.

12 Rodriguez, can you raise your right hand, please?

13 Do you swear or affirm that the testimony you are

14 going to give today is the truth?

15     MS. RODRIGUEZ: Yes, I do.

16     HEARING OFFICER KRAMER: Okay, thank

17 you.

18     MR. SINSHERMER: Ms. Rodriguez, I want

19 you to tell us a little bit about Robert. He was

20 born when?

21     MS. RODRIGUEZ: September 6. 1995.

22     MR. SINSHERMER: And was the birth

23 normal?

24     MS. RODRIGUEZ: Yes, it was.

25     MR. SINSHERMER: And did he start to go

8

1 to school at some point in time?

2     MS. RODRIGUEZ: Yes, he did.

3     MR. SINSHERMER: Tell me when.

4     MS. RODRIGUEZ: I first, he first

5 started Pre-K, P.S. 76, before that I noticed

6 that he had delays with his speech and I was

7 really looking for help. I took him to Kennedy

8 Center (phonetic) for evaluation, which he

9 received constantly some kind of help with

10 speech. Then after that I took him to Rainbow

11 School, when he was ready to go to Pre-K, where

12 they did an evaluation and again he received

13 services there, speech constantly and he was in a

14 specialty class. Then he was ready to go to the

15 regular school and Kindergarten at P.S. 76 in the

16 Bronx, when he was--

17     MR. SINSHERMER: Was he classified at

18 that time?

19     MS. RODRIGUEZ: Yes.

20     MR. SINSHERMER: And what was the

21 classification?

22     MS. RODRIGUEZ: Speech.

23     MR. SINSHERMER: Speech and language?

24     MS. RODRIGUEZ: Speech and language.

25     MR. SINSHERMER: Okay. And how did he

10

1 complaining because the teacher, I don't remember
2 his name right now, but they say, they don't have
3 the space at that school for Robert and then I
4 ask them what else they can do for me to help
5 Robert somehow. And they ask me if I want him to
6 transfer to another school, which I agree,
7 because I know P.S. 96, because my daughter went
8 there. And I like the school and then they
9 transferred him in the middle of second grade to
10 P.S. 96.
11       MR. SINSHERMER:  What happened in the
12 second grade?
13       MS. RODRIGUEZ:  In P.S. 96 he gets some
14 improvement. He was there until fifth grade.
15       MR. SINSHERMER:  Until fifth grade. Why
16 did you decide to look around for another school?
17       MS. RODRIGUEZ:  I was worried about it
18 because I know like what Mr. Velez (phonetic)—
19       MR. SINSHERMER:  Excuse me; who is Mr.
20 Velez?
21       MS. RODRIGUEZ:  He was the teacher for
22 almost three years.
23       MR. SINSHERMER:  And what did he tell
24 you, anything?
25       MS. RODRIGUEZ:  Yes, he told me that

9

1 do there?
2       MS. RODRIGUEZ:  He didn't do well at all
3 and I went outside school to arrange—
4       HEARING OFFICER KRAMER:  (Interposing)
5 I'm sorry to interrupt, but did you say he was
6 there for Pre-K or for Kindergarten?
7       MS. RODRIGUEZ:  In Pre-K he was at
8 Rainbow School -- and then Kindergarten he went
9 to P.S. 76.
10       HEARING OFFICER KRAMER:  Okay.  Sorry.
11       MR. SINSHERMER:  How did he do at P.S.
12 76?
13       MS. RODRIGUEZ:  He didn't do well at
14 all. Like the second grade I noticed a lower
15 delay behind. He doesn't know how to count, he
16 doesn't know the ABC at all and I also, I asked
17 for an evaluation and looked for help outside the
18 school. I took him to Astor Place (phonetic).
19       MR. SINSHERMER:  What place?
20       MS. RODRIGUEZ:  Astor. It's like a
21 center. Astor Center. And I asked the school if
22 there is anything they can do about it because I
23 didn't see no improvement at all, but and I was
24 asking them at least to change the classroom
25 because he wasn't doing well and everybody was

5

11

1 there were trying to change Robert and put him in
2 general class, for the following year, that was
3 sixth grade, because that school only goes to
4 fifth grade.
5 MR. SINSHERMER: Why did he say they
6 were going to do that?
7 MS. RODRIGUEZ: Because they don't have
8 a setting for those kids. Ms.; the guidance
9 counselor, Ms. Kennedy (phonetic) also tells me
10 the same thing. And that's when they asked me,
11 they gave it to all the parents, some papers to
12 put their kids in some kind of you know, charter
13 school. I don't know - - and then they suggest
14 that I should choose Aspire (phonetic) for him.
15 MR. SINSHERMER: Aspire.
16 MS. RODRIGUEZ: Yes.
17 MR. SINSHERMER: Is that a charter
18 school?
19 MS. RODRIGUEZ: Yes, P.S. 175.
20 MR. SINSHERMER: And did you get a hold
21 of somebody at the Aspire school?
22 MS. RODRIGUEZ: No.
23 MR. SINSHERMER: And did you talk to
24 anybody about the Aspire school?
25 MS. RODRIGUEZ: No.

12

1 MR. SINSHERMER: That was at a parent
2 conference, was it not, in February?
3 MS. RODRIGUEZ: Around February, I don't
4 remember. Around February, I think - -
5 MR. SINSHERMER: Now you haven't
6 received any placement to the Aspire School, have
7 you?
8 MS. RODRIGUEZ: No.
9 MR. SINSHERMER: And you haven't
10 received any placement to any school this year,
11 have you?
12 MS. RODRIGUEZ: No.
13 MR. SINSHERMER: And have you ever
14 failed to go to a meeting when asked to?
15 MS. RODRIGUEZ: Never.
16 MR. SINSHERMER: Have you ever failed in
17 any way to cooperate with the CSE, with the
18 school authorities?
19 MS. RODRIGUEZ: No.
20 MR. SINSHERMER: Now you started to; you
21 testified you were going to look for private
22 schools. How did you come to that decision?
23 MS. RODRIGUEZ: Because I know that
24 Robert wasn't ready and he's not ready; he's not
25 prepared to go on to General Education class in

13

1  regular classes on his IEP. And I know as his
2  mother that Robert wouldn't do well in general
3  education.
4       MR. SINSHERMER: On the last IEP, for
5  2004-2005, is it true that he was put in a twelve
6  to one-to-one class?
7       MS. RODRIGUEZ: Yes.
8       MR. SINSHERMER: And did anybody tell
9  you that it should be twelve to one instead?
10      MS. RODRIGUEZ: No.
11      MR. SINSHERMER: When you started to
12  look for schools, where did you go?
13      MS. RODRIGUEZ: I went to the Library; I
14  went everywhere. I asked people around to -- -- I
15  look for them on the Internet and I was just
16  looking on a list for special classes for kids,
17  everywhere until I found. I found different
18  schools and one of them was -- -- was the Churchill
19  School, the other one was the Gateway School
20  (phonetic), they were late in the process.
21      MR. SINSHERMER: That's Churchill and
22  Gateway?
23      MS. RODRIGUEZ: Yes. Then I think I
24  found Winston and I went to the open house and I
25  fill out the application that was a process.

Ubiqus/Nation-Wide Reporting & Convention Coverage
22 Cortlandt Street - Suite 802, New York, NY 10007
Phone: 212-227-7440 * 800-221-7242 * Fax: 212-227-7524

14

1  Robert was put on the waiting list and then they
2  finally call me back he got a space in the
3  school.
4       MR. SINSHERMER: And he's there now?
5       MS. RODRIGUEZ: He's there now.
6       MR. SINSHERMER: And has he been there
7  since the beginning of school?
8       MS. RODRIGUEZ: I can't describe how
9  happy—
10      MR. SINSHERMER: (Interposing) No,
11  that's not the question. Has he been there since
12  the beginning of school in September?
13      MS. RODRIGUEZ: Yes.
14      MR. SINSHERMER: Now tell me now he's
15  doing.
16      MS. RODRIGUEZ: He's doing great. He's
17  another child. Like before he used to cry every
18  morning to go to school because it was so much
19  stress because they don't understand the class.
20  The classes were hard. Everyone, it's too hard
21  for me. And how he get up happy, even the other
22  day he calls me. I was so surprised, he say,
23  "You are my hero, Mom, because you found me a
24  school. I'm so happy in school, the teacher, the
25  classes are easy for me." And when he come home

Ubiqus/Nation-Wide Reporting & Convention Coverage
22 Cortlandt Street - Suite 802, New York, NY 10007
Phone: 212-227-7440 * 800-221-7242 * Fax: 212-227-7524

16

1   MS. RODRIGUEZ: Right now my daughter's
2   in boarding school, she's away, and my mother
3   used to live with me but she's back to Dominican
4   Republic, so right now it's only Robert and me.
5   MR. SINSHERMER: Can you afford to up
6   front the tuition at—
7   MS. RODRIGUEZ: (Interposing) No.
8   MR. SINSHERMER: Winston? I have no
9   further questions.
10  MR. PARENT: Yes. Ms. Rodriguez, do you
11  recall last school year, speaking to Mr. Velez,
12  the teacher, about Robert going to 144?
13  MS. RODRIGUEZ: No.
14  MR. PARENT: Middle School 144?
15  MS. RODRIGUEZ: I never heard about the
16  school until like the middle of September, like,
17  they kept calling me, some recorder, that saying
18  that your child has been absent from school.
19  This is a recorder from the attendance office.
20  And he's calling; your son has been absent from
21  school. And I say I didn't know who is calling
22  me from. And then the next day I call back and I
23  spoke to a lady and she say, I don't know if it's
24  this school and she say, "This is P.S. 144." And
25  I told my son's name and I told her that we

15

1   now he don't have no problems with homework. He
2   do his homework and he kind of knows what he's
3   doing. So it's amazing, the change. It's like
4   he's another child.
5   MR. SINSHERMER: Tell me, are you
6   employed?
7   MS. RODRIGUEZ: Yes.
8   MR. SINSHERMER: Who are you employed
9   by?
10  MS. RODRIGUEZ: I work for the Supreme
11  Court as a secretary.
12  MR. SINSHERMER: The Supreme Court of
13  New York State?
14  MS. RODRIGUEZ: New York State. I work
15  under the 69th Committee (phonetic). I'm a
16  secretary for five years now; four years now.
17  MR. SINSHERMER: So what is your total
18  income?
19  MS. RODRIGUEZ: Right now it's $35,000.
20  MR. SINSHERMER: Is that the total
21  income of everybody in your family that lives
22  with you?
23  MS. RODRIGUEZ: Yes.
24  MR. SINSHERMER: And how many people do
25  live with you?

8

17

1 already sent a letter saying that Robert was
2 going to go to a private school. And she say,
3 "are you sure of that?" Yeah, I spoke to Mr.
4 Velez like, in the middle, like at the end of
5 September, and --
6     MR. PARENT: Can we go off the record?
7     HEARING OFFICER KRAMER: I'm sorry?
8     MR. PARENT: Can we go off the record a
9 minute?
10     HEARING OFFICER KRAMER: Why?
11     MR. PARENT: Okay, well, just even
12 though I conceded Prong 1, just for the accuracy
13 of the factual record, I can rebut the parent's
14 comments, the witness, about 144.
15     HEARING OFFICER KRAMER: Please do it
16 yourself, you're not a witness. You can ask her
17 additional questions --
18     MR. PARENT: Okay.
19     HEARING OFFICER KRAMER: But you
20 stipulated to Prong 1, so I don't know why you
21 care.
22     MR. PARENT: Well, just for the accuracy
23 of the factual record.
24     HEARING OFFICER KRAMER: Well, we're not
25 going to be discussing that, because it's

18

1 irrelevant.
2     MR. PARENT: Okay.
3     HEARING OFFICER KRAMER: It's
4 stipulated, it's irrelevant.
5     MR. PARENT: Okay.
6     HEARING OFFICER KRAMER: Or you can
7 bring in a witness and not stipulate.
8     MR. PARENT: Okay, no further questions.
9     HEARING OFFICER KRAMER: I have several
10 questions. You said that your child did not
11 receive a placement for this current year. When
12 was his IEP meeting? Did he have an IEP meeting?
13     MS. RODRIGUEZ: No. Last year, around
14 September.
15     HEARING OFFICER KRAMER: And that's when
16 he was de-classified?
17     MS. RODRIGUEZ: No. This and that they
18 told me that he was going to go to a Special Ed
19 class.
20     HEARING OFFICER KRAMER: In October of
21 2005 he was still Special Ed?
22     MS. RODRIGUEZ: Mm-hmm.
23     HEARING OFFICER KRAMER: But you never
24 had any, a review for placement for this year?
25     MS. RODRIGUEZ: Mm-mm.

19

1   HEARING OFFICER KRAMER: Okay. You said
2   that he needed a private placement because he
3   can't do well in a general education class. How
4   did he come to be considered for a general
5   education class that was recommended on his IEP?
6   MS. RODRIGUEZ: No. But they; I heard a
7   comment from several of the school counselors.
8   HEARING OFFICER KRAMER: But no one ever
9   told you he was going to be placed in a general
10  education class?
11  MS. RODRIGUEZ: That's what they told me
12  they was trying to do.
13  HEARING OFFICER KRAMER: But no one ever
14  told you that he was going to be placed; in other
15  words you didn't get a placement in a general
16  education class?
17  MS. RODRIGUEZ: I didn't see anything
18  from the Board, not from the Department, no
19  letter telling me where he's going.
20  HEARING OFFICER KRAMER: And you said
21  that Winston is good for him because it's easy
22  for him?
23  MS. RODRIGUEZ: I see the difference
24  now. Like before he was very like frustrated,
25  like to do his work. And now I see that the

Ubiqui/Nation-Wide Reporting & Convention Coverage
22 Cortland Street - Suite 802, New York, NY 10007
Phone: 212-227-7440 * 800-221-7242 * Fax: 212-227-7324

20

1   difference is like, he's fine. He's like; I say,
2   "Why you like Winston now, like better than P.S.
3   962" And he say, "Because I understand my
4   teacher much better. And now I understand what
5   I'm doing. And you know he's simpler. And I
6   like the teacher of the class, everybody's nice
7   and kind, you know, to take time to explain to
8   me."
9   HEARING OFFICER KRAMER: How big is his
10  class at Winston?
11  MS. RODRIGUEZ: Eight or seven, it's
12  different. He goes to different, for like math
13  he goes to one class and so—
14  HEARING OFFICER KRAMER: (Interposing)
15  What's the largest class he's in?
16  MS. RODRIGUEZ: In Winston? I guess
17  twelve. I didn't, I'm sorry because I haven't
18  gone to the; they don't have; the meeting's next
19  month.
20  HEARING OFFICER KRAMER: Is Winston a
21  school for Special Education children?
22  MS. RODRIGUEZ: Yes. The whole school
23  from sixth grade to high school.
24  HEARING OFFICER KRAMER: And do you know
25  what sort of disabilities are addressed at

Ubiqui/Nation-Wide Reporting & Convention Coverage
22 Cortland Street - Suite 802, New York, NY 10007
Phone: 212-227-7440 * 800-221-7242 * Fax: 212-227-7324

21

Winston?

1  
2    MS. RODRIGUEZ: I know they have to deal
3  with kids with learning disabilities and kids
4  with dyslexia.
5    HEARING OFFICER KRAMER: I'm sorry?
6  Dyslexia?
7    MS. RODRIGUEZ: Yes.
8    HEARING OFFICER KRAMER: Then your son
9  has never been diagnosed with dyslexia?
10    MS. RODRIGUEZ: No, I said the school
11  is—
12    HEARING OFFICER KRAMER: (Interposing)
13  Right. This is another question. Your son has
14  never been diagnosed with dyslexia?
15    MS. RODRIGUEZ: No. Learning
16  Disabilities.
17    HEARING OFFICER KRAMER: He's been
18  diagnosed with Learning Disabilities. Okay. Do
19  they provide him with speech and language therapy
20  in Winston?
21    MS. RODRIGUEZ: Yes. That's the first
22  class, focused. The first thing.
23    HEARING OFFICER KRAMER: Have you had
24  any tests so far?
25    MS. RODRIGUEZ: In Winston? No.

22

Winston?

1    HEARING OFFICER KRAMER: Have you spoken
2  to any of his teachers so far?
3    MS. RODRIGUEZ: Yes, they always keep in
4  touch, especially his Focus teacher is the one
5  that like, calls every week to tell how he's
6  doing.
7    HEARING OFFICER KRAMER: Okay. And how
8  many conversations have you had with his teacher?
9    MS. RODRIGUEZ: Two.
10    HEARING OFFICER KRAMER: Just two?
11    MS. RODRIGUEZ: Mm-hmm.
12    HEARING OFFICER KRAMER: Since the
13  beginning of school?
14    MS. RODRIGUEZ: Yes.
15    HEARING OFFICER KRAMER: And what has
16  she said?
17    MS. RODRIGUEZ: That Robert's adjusting
18  to his class and he seems to be very comfortable
19  in the classroom now with most of the other
20  students.
21    HEARING OFFICER KRAMER: Do you know if
22  she ever had any conversations with Mr. Velez?
23    MS. RODRIGUEZ: No, I don't know.
24    HEARING OFFICER KRAMER: Do you know if
25  she ever reviewed his prior achievement levels at

**23**

1   his public school last year?
2        MS. RODRIGUEZ: I think she does. She
3   told me that Robert like, he seems a lot more
4   different than what they say in the IEP.
5        HEARING OFFICER KRAMER: Has she told
6   you anything about his academic achievement?
7        MS. RODRIGUEZ: No.
8        HEARING OFFICER KRAMER: Did the child
9   go through a screening process at Winston?
10       MS. RODRIGUEZ: Yes, at first before he
11  got admitted he have the interview, like one two
12  hour in the classroom to see how he works.
13       HEARING OFFICER KRAMER: How many hours?
14       MS. RODRIGUEZ: Like, three hours. Like
15  - -
16       HEARING OFFICER KRAMER: So he didn't
17  start there on the first, right?
18       MS. RODRIGUEZ: He started school on the
19  first day.
20       HEARING OFFICER KRAMER: When did they
21  observe him in the classroom, on the first day?
22       MS. RODRIGUEZ: No. Before he come, it
23  was before he started school. Yeah, but like,
24  one day that they gotta go to the school, to see
25  how it works with all the kids. - - I can't

**24**

1   recall the date. - -
2        HEARING OFFICER KRAMER: So was he with
3   those kids in the school?
4        MS. RODRIGUEZ: Yeah.
5        HEARING OFFICER KRAMER: So was it
6   fading in a Summer School curriculum then?
7        MS. RODRIGUEZ: It was like at the end
8   of the school year. In June, around June.
9        HEARING OFFICER KRAMER: In June. So he
10  went for an interview in June?
11       MS. RODRIGUEZ: Yes.
12       HEARING OFFICER KRAMER: You said that
13  your total income was $35,000; do you own any
14  properties?
15       MS. RODRIGUEZ: No.
16       HEARING OFFICER KRAMER: Do you own a
17  car?
18       MS. RODRIGUEZ: No.
19       HEARING OFFICER KRAMER: Do you have a
20  bank account?
21       MS. RODRIGUEZ: Excuse me?
22       HEARING OFFICER KRAMER: Do you have a
23  bank account?
24       MS. RODRIGUEZ: Yes, I have checking and
25  savings.

25

1  HEARING OFFICER KRAMER: And can I ask
2  you what's in your savings account?
3  MS. RODRIGUEZ: Not much, around, I
4  don't have that much. I don't know, about $800.
5  HEARING OFFICER KRAMER: How much is in
6  your checking account?
7  MS. RODRIGUEZ: Less than $200.
8  HEARING OFFICER KRAMER: Do you rent
9  your apartment?
10  MS. RODRIGUEZ: Yes.
11  HEARING OFFICER KRAMER: And what is
12  your monthly rental?
13  MS. RODRIGUEZ: $975.
14  HEARING OFFICER KRAMER: Do you have any
15  other monthly expenses.
16  MS. RODRIGUEZ: Cable, telephone.
17  HEARING OFFICER KRAMER: Cable TV?
18  MS. RODRIGUEZ: TV, yes.
19  HEARING OFFICER KRAMER: So then that's
20  another $200 a month, would you say, between
21  telephone, cable and internet?
22  MS. RODRIGUEZ: Yes.
23  HEARING OFFICER KRAMER: Something like
24  that. And does Robert receive any kind of
25  disability money?

26

1  MS. RODRIGUEZ: Oh yes, I forgot. Yes,
2  he receives Social Security.
3  HEARING OFFICER KRAMER: And how much is
4  that?
5  MS. RODRIGUEZ: Like, $600.
6  HEARING OFFICER KRAMER: A month?
7  MS. RODRIGUEZ: Yes.
8  HEARING OFFICER KRAMER: And what is
9  that for?
10  MS. RODRIGUEZ: Just for everything in
11  the house, the how -- the different things I
12  can't really afford myself.
13  HEARING OFFICER KRAMER: So that's
14  another $7,200 a year. Do you get any other
15  disability checks from anybody else in your
16  household?
17  MS. RODRIGUEZ: No.
18  HEARING OFFICER KRAMER: Okay. And what
19  is the tuition at Winston?
20  MR. SINSHERMER: $38,600 I think. It's
21  in the--
22  HEARING OFFICER KRAMER: (Interposing)
23  I know, I'm trying to find that document. I
24  don't think you gave me that. I think you took
25  it away when you were going to give me another

28

1  asking you whether or not the school has any

2  particular way in which you can borrow money to

3  pay for tuition. Several schools have tuition

4  loan programs.

5      MS. RODRIGUEZ: Yeah, they give me some

6  paper, like different kind of programs.

7      HEARING OFFICER KRAMER: And you haven't

8  looked into them?

9      MS. RODRIGUEZ: No.

10      HEARING OFFICER KRAMER: Do you know if

11  they're low interest rates? Do you know if

12  they're interest free? Do you know anything like

13  that?

14      MS. RODRIGUEZ: No. I was waiting, to

15  be honest I was waiting for - -

16      HEARING OFFICER KRAMER: What grade is

17  Robert in at this point?

18      MS. RODRIGUEZ: He's supposed to be in

19  sixth grade.

20      HEARING OFFICER KRAMER: And is he in

21  sixth grade at Winston? Can I see the contract

22  with the school please? Has any part of his

23  tuition been paid yet?

24      MR. SINSHERMER: There is—

25      HEARING OFFICER KRAMER: (Interposing)

27

1  one.

2      MR. SINSHERMER: No the Winston, no.

3      HEARING OFFICER KRAMER: Because it was

4  an original and we were going to make a copy.

5      MR. SINSHERMER: Oh okay.

6      HEARING OFFICER KRAMER: I think you

7  took it away from me.

8      MR. SINSHERMER: I don't have it.

9      HEARING OFFICER KRAMER: It doesn't

10  matter. You can get it later. I can get it

11  later.

12      MR. SINSHERMER: Oh, here it is. What

13  was, it's $38,750.

14      HEARING OFFICER KRAMER: And does the

15  school have any ability to lend you money? Do

16  they have a loan program? Did you ask?

17      MS. RODRIGUEZ: Yeah, they have a FIP

18  (phonetic) program.

19      HEARING OFFICER KRAMER: And do you

20  qualify for any of them?

21      MS. RODRIGUEZ: I haven't tried.

22      HEARING OFFICER KRAMER: Haven't tried.

23      MS. RODRIGUEZ: I called FIP a few

24  times, but I didn't, I can't afford to pay alone.

25      HEARING OFFICER KRAMER: No, but I'm

1    I'm asking the witness.
2        MR. SINSHERMER: Oh. Okay.
3        MS. RODRIGUEZ: The -- phone call at
4    the -- phone. And they pay what they call the
5    bridge loan. It was—
6        HEARING OFFICER KRAMER: What is that
7    name? Yes or no? Tuition's been paid or not?
8        MS. RODRIGUEZ: Not the whole tuition
9    was paid.
10       HEARING OFFICER KRAMER: How much?
11       MS. RODRIGUEZ: The first deposit,
12   $3,875.
13       HEARING OFFICER KRAMER: And that's
14   through a bridge loan from where?
15       MS. RODRIGUEZ: The Fairness Fund.
16       HEARING OFFICER KRAMER: The what?
17       MS. RODRIGUEZ: The Fairness Fund.
18       HEARING OFFICER KRAMER: I don't know
19   what you --
20       MS. RODRIGUEZ: They then wanted to hold
21   us back.
22       HEARING OFFICER KRAMER: And what is a
23   Fairness Fund?
24       MS. RODRIGUEZ: Excuse me?
25       HEARING OFFICER KRAMER: What is the

Ubiqus/Nation-Wide Reporting & Convention Coverage
22 Cortlandt Street - Suite 802, New York, NY 10007
Phone: 212-227-7440 * 800-221-7242 * Fax: 212-227-7524

1    Fairness Fund?
2        MS. RODRIGUEZ: It's like, can Mr.
3    Sinshermer explain? Because I really can't
4    explain to you.
5        HEARING OFFICER KRAMER: You can't
6    explain.
7        MS. RODRIGUEZ: It's like some kind of
8    hold so he can hold his spot.
9        HEARING OFFICER KRAMER: And how did you
10   find this Fairness Fund?
11       MS. RODRIGUEZ: I asked Mr. Sinshermer
12   and I hope because I can't be paying out that
13   kind of money. I don't want Robert to lose his
14   spot.
15       HEARING OFFICER KRAMER: And what kind
16   of interest are you paying on the $3,875 that
17   you've paid?
18       MS. RODRIGUEZ: No, I—
19       HEARING OFFICER KRAMER: (Interposing)
20   Interest-free?
21       MS. RODRIGUEZ: --
22       HEARING OFFICER KRAMER: Okay. And it
23   says here that on October 1st she has to pay
24   $17,437.50. If not, well actually on June 1st,
25   2006, you had to pay $17,437.50; did you pay that

Ubiqus/Nation-Wide Reporting & Convention Coverage
22 Cortlandt Street - Suite 802, New York, NY 10007
Phone: 212-227-7440 * 800-221-7242 * Fax: 212-227-7524

15

31

1  money?

2       MS. RODRIGUEZ: No.

3       HEARING OFFICER KRAMER: And they

4  admitted him anyway?

5       MS. RODRIGUEZ: Because like when they;

6  when Robert got approved because he was on

7  waiting list, that date already passed and I

8  spoke to them and they say.

9       HEARING OFFICER KRAMER: What'd they

10  say?

11       HEARING OFFICER KRAMER: I spoke to them

12  and they say like, just don't worry about it.

13  We're going to work with them. We have time.

14  They did like, extension. And I-

15       HEARING OFFICER KRAMER: (Interposing)

16  What about the second payment that was due on

17  October 1st?

18       MS. RODRIGUEZ: No. I didn't pay.

19       HEARING OFFICER KRAMER: So they're not

20  going to kick him out if you don't pay on time,

21  right?

22       MS. RODRIGUEZ: --

23       HEARING OFFICER KRAMER: Okay, I have no

24  further questions.

25       MR. SINSHERMER: I'd like to go back.

32

1       HEARING OFFICER KRAMER: Please do.

2       MR. SINSHERMER: I'd like to talk about

3  the Fairness Fund. Because of the fact that when

4  you apply for Winston Prep, they gave you

5  application for the Fairness Fund?

6       MS. RODRIGUEZ: Yes.

7       MR. SINSHERMER: And did you in fact,

8  fill that application out and send it to the

9  Fairness Fund?

10       MS. RODRIGUEZ: Yes, I did.

11       MR. SINSHERMER: And did the Fairness

12  Fund send you a contract which you signed?

13       MS. RODRIGUEZ: Yes.

14       MR. SINSHERMER: In which you said you

15  did not have to pay any interest?

16       MS. RODRIGUEZ: Yes.

17       MR. SINSHERMER: In which it said you

18  did not have to pay it back in case you lost?

19       MS. RODRIGUEZ: Yes, that's correct.

20       MR. SINSHERMER: And that's enough, I

21  think.

22       HEARING OFFICER KRAMER: Anything else?

23       MR. PARENT: No.

24       HEARING OFFICER KRAMER: Well, it's

25  10:30, so I guess the other witness can stay.

33

1  It's 10:35, actually.
2     MR. SINSHERMER: Okay. May I go off the
3  record and call?
4     HEARING OFFICER KRAMER: I'll go off the
5  record for a minute.
6     (OFF THE RECORD)
7     (ON THE RECORD)
8     MR. SINSHERMER: Would you state your
9  full name and your position at Winston?
10    MS. BETH SUGARMAN: Beth Sugarman,
11 Director of Operations and Educational Research.
12    MR. SINSHERMER: And tell me what are
13 your educational qualifications?
14    MS. SUGARMAN: I'm a Speech and Language
15 Pathologist, a Master's from Teachers College at
16 Columbia University and I've been employed at
17 Winston Prep for the last nine years.
18    MR. SINSHERMER: And what does your job
19 at Winston Prep entail?
20    MS. SUGARMAN: I oversee placement of
21 children to ensure that they're placed in an
22 appropriate group based upon a learning profile
23 as well as testing incoming students and current
24 students.
25    MR. SINSHERMER: Are you familiar with

34

1  Robert Rios?
2     MS. SUGARMAN: Yes, I am.
3     MR. SINSHERMER: And tell us, when did
4  he start at Winston?
5     MS. SUGARMAN: He started this
6  September, just last month.
7     MR. SINSHERMER: And what is the process
8  by which he was accepted?
9     MS. SUGARMAN: It was deemed appropriate
10 that Robert has, is possessed with a non-verbal
11 learning disorder; has difficulty with
12 comprehension and vocabulary and we have a group
13 of students based upon that particular profile,
14 so we grouped him with those students in order to
15 teach a more homogenous class.
16    MR. SINSHERMER: And are all of the
17 classes at Winston homogenous with respect to the
18 disabilities of the child?
19    MS. SUGARMAN: Yes, they are. Yes, we
20 group students based upon their learning profile
21 so that we're teaching to their strengths as well
22 as to their weaknesses.
23    MR. SINSHERMER: Do you as a matter of -
24 -, do you know how long Winston has been in
25 existence?

35

1    MS. SUGARMAN: This is our twenty-sixth
2  year.
3    MR. SINSHERMER: And tell me what
4  success do you have with your students that
5  graduate? What percentage of yours students
6  graduate?
7    MS. SUGARMAN: 100% of our students
8  graduate, ninety-eight, ninety-nine percent go on
9  to college based upon that particular graduating
10  class. But we're on average about ninety-eight
11  percent.
12    MR. SINSHERMER: And your school is an
13  entirely Special Ed school?
14    MS. SUGARMAN: Yes, we are 100% Special
15  Ed.
16    MR. SINSHERMER: And speaking
17  specifically about Robert, based on your
18  knowledge of his record and your interviewing of
19  him and his performance there in the past six
20  weeks or five weeks, I don't know how long it's
21  been: are you convinced that Winston is an
22  appropriate placement for him?
23    MS. SUGARMAN: Yes, very much so. Very
24  much so. And actually I met with Robert's
25  teacher yesterday to kind of update his gains

Ubiqus/Nation-Wide Reporting & Convention Coverage
22 Cortlandt Street - Suite 802, New York, NY 10007
Phone: 212-227-7440 * 800-221-7242 * Fax: 212-227-7524

36

1  since he's been attending Winston, and Peter Hill
2  who has him for three periods throughout the day,
3  mentioned that he is just beginning to come out
4  of his shell and seems to be comfortable now with
5  raising his hand and participating in class. He
6  needs a lot of repetition in order to understand
7  information. He's still struggling with more
8  conceptual understanding and critical thinking
9  analysis. We're working on vocabulary,
10  comprehension, you know, more abstract reasoning
11  type of abilities.
12    MR. SINSHERMER: There are no general
13  education students at Winston?
14    MS. SUGARMAN: No. Every one of the
15  students is here with a Learning Disability, has
16  a documented Learning Disability. This is not a
17  mainstream setting.
18    MR. SINSHERMER: Are there any
19  opportunities for him to be with his non-disabled
20  peers?
21    MS. SUGARMAN: Not here at Winston.
22    MR. SINSHERMER: Tell me do you know
23  what the tuition at Winston is?
24    MS. SUGARMAN: $38,750.
25    MR. SINSHERMER: And would you tell us

Ubiqus/Nation-Wide Reporting & Convention Coverage
22 Cortlandt Street - Suite 802, New York, NY 10007
Phone: 212-227-7440 * 800-221-7242 * Fax: 212-227-7524

18

37

```
 1    little bit about the Focus group at Winston?
 2         MS. SUGARMAN:  Focus Program at Winston
 3    is where each student receives one-to-one
 4    remediation and is paired with a specialist based
 5    upon their particular learning profile.  It is a
 6    skill-based program, it's not a tutorial program,
 7    so within the one-to one setting every single
 8    day, and again, it's part of our curriculum, so
 9    Robert is not pulled out of a class—
10         HEARING OFFICER KRAMER:  (Interposing)
11    Could you speak a little slower please?
12         MS. SUGARMAN:  Working with a reading
13    specialist to help him—
14         MR. SINSHERMER:  (Interposing) Ms.
15    Sugarman, the Hearing Officer would like you to
16    speak a little slower.
17         HEARING OFFICER KRAMER:  You're speaking
18    much too quickly for me.
19         MS. SUGARMAN:  I'm sorry.
20         HEARING OFFICER KRAMER:  I'm not
21    following what you're saying.  I'm sorry.
22         HEARING OFFICER KRAMER:  Okay.  He is
23    paired with a learning specialist each and every
24    day.  And his particularly focus instructor is a
25    reading specialist and he meets with her every
```

Ubique/Nation-Wide Reporting & Convention Coverage
22 Cortlandt Street - Suite 802, New York, NY 10007
Phone: 212-227-7440 * 800-221-7242 * Fax: 212-227-7524

38

```
 1    day for forty minutes as part of his curriculum.
 2    He's not pulled out of a class for his focus
 3    period.  Each student receives a forty-minute
 4    one-to-one period each and every day.  And within
 5    this class the instructor, his reading teacher,
 6    will target more specifically vocabulary skills,
 7    comprehension skills, based upon Robert's
 8    particular strengths, weaknesses and scaffolding
 9    from what takes place throughout the curriculum
10    to further develop skills and abilities.
11         MR. SINSHERMER:  And what reports have
12    you had from the Focus teacher and the other
13    teachers?
14         MS. SUGARMAN:  Focus teacher said that
15    although very shy at first, Robert didn't really
16    participate, more so not due to his being
17    difficult, due to I think his just being a little
18    shy and uncertain in a new setting, but that he's
19    recently begun to really participate more so in
20    the one-to-one setting and seems to be more
21    comfortable admitting when things are difficult
22    for him.  In the classroom the teacher says that
23    he requires a lot of repetition, and information
24    to be presented slowly and broken down for him on
25    a consistent basis.  And he's in a class with
```

Ubique/Nation-Wide Reporting & Convention Coverage
22 Cortlandt Street - Suite 802, New York, NY 10007
Phone: 212-227-7440 * 800-221-7242 * Fax: 212-227-7524

40

1  he's a very concrete, very, very concrete
2  learner.
3      MR. PARENT:  Okay.  Does your school
4  address language delays?
5      (BREAK IN AUDIO)
6      MS. SUGARMAN:  Yes.  And what we do with
7  our children that have language delays is again,
8  we break the information down into visual
9  presentations as well as auditory presentations.
10  It's repeated at the onset of every class as far
11  as what did we do yesterday, what did we learn.
12  Again, these students need a tremendous amount of
13  repetition, due to some vocabulary weaknesses, we
14  try to teach them how to use context clues in
15  which to improve their understanding of language.
16  Robert also has some deficits in his decoding
17  skills which I'm sure are impacting his
18  comprehension as well, as well as his written
19  language.  So he's, you know, across the board he
20  has difficulties in reading comp, listening
21  comprehension, mathematical difficulties,
22  certainly with word problems.  So we just try to
23  break information down.  Really good students
24  understand the visual appreciation for language
25  and to provide them with semantic maps our

39

1  twelve students, so he has the opportunity in
2  which to you know, really just have information
3  broken down at that pace for the class as well.
4      MR. SINSHERMER:  He's in a class with
5  twelve students, how many teachers?
6      MS. SUGARMAN:  One teacher.
7      MR. SINSHERMER:  And are your teachers
8  there certified Special Ed teachers?
9      MS. SUGARMAN:  Yes.
10      MR. SINSHERMER:  I have no further
11  questions.
12      HEARING OFFICER KRAMER:  Mr. Parent?
13      MR. PARENT:  Yes, Ms. Sugarman?
14      MS. SUGARMAN:  Yes.
15      MR. PARENT:  You're not a State Approved
16  school, is that correct?
17      MS. SUGARMAN:  No, we are not.
18      MR. PARENT:  And now you mentioned at
19  the beginning of your testimony that Robert is
20  grouped according to having a Non-verbal Learning
21  Disorder?
22      MS. SUGARMAN:  Well, he presents with,
23  his skills are low-functioning, I say non-verbal
24  in that he has difficulty with more abstract
25  thinking; difficulty with making connections,

41

1  outlines or some type of repetition and guidance
2  with which to help them understand information
3  more clearly.
4  MR. PARENT: Do you use any particular
5  sort of reading program in your school?
6  MS. SUGARMAN: Robert's focus teacher
7  is, as I mentioned, a Reading Specialist, I
8  believe she has two Masters degrees, in
9  particular one in Learning Disabilities and one
10  in Reading Disabilities. And I believe that she
11  is working upon targeting with Wilson Program as
12  well as the Preventing Academic Failure Program
13  and I think she takes pieces from each and
14  utilizes those with Robert based upon what his
15  needs are and whatever that particular objective
16  is at that given time. We kind of mix. We don't
17  necessarily utilize one particular program.
18  MR. PARENT: Okay. Can you tell me what
19  Robert's reading level is now in terms of grade
20  level?
21  MS. SUGARMAN: 3.3, third grade.
22  MR. PARENT: And that's based on what?
23  MS. SUGARMAN: That's on the Woodcock-
24  Johnson (phonetic).
25  MR. PARENT: Administered when?

42

1  MS. SUGARMAN: Based upon our records
2  that was 2005, October 2005.
3  MR. PARENT: Okay, you're referring to
4  testing noted on the October '05 IEP?
5  MS. SUGARMAN: Yes, that's according to
6  the information I have before me.
7  MR. PARENT: So you haven't done any new
8  assessment?
9  MS. SUGARMAN: Not at this time.
10  MR. PARENT: Okay, no further questions.
11  HEARING OFFICER KRAMER: Okay, I have a
12  couple of questions. You said that you were in
13  charge of testing incoming students?
14  MS. SUGARMAN: I will test some of the
15  admission students.
16  HEARING OFFICER KRAMER: Did you test
17  Robert?
18  MS. SUGARMAN: Did I test Robert? No, I
19  did not. The admissions director tested him.
20  HEARING OFFICER KRAMER: And what did
21  they test him about?
22  MS. SUGARMAN: The Test of Written
23  Language, we like to get a writing sample from
24  students. We also do the VMI (phonetic) as well
25  as parts of the TONY (phonetic), which Robert had

21

43

1  some difficulties with. We'll also not
2  necessarily in Robert's case, but because he did
3  come in with your recent testing, but based upon
4  student's information that they have and how
5  updated or current it is, we'll sometimes give
6  pieces of SELF (phonetic).
7      HEARING OFFICER KRAMER: And the purpose
8  of the tests are?
9      MS. SUGARMAN: To determine again, to
10  kind of confirm that your findings or whatever
11  the testing is that the students presents with,
12  are commensurate with what our findings are. You
13  know, we try to get as much information as we can
14  about a student, just to confirm what testing is
15  presented with what we find here. Because as you
16  know, it's one thing to read information on paper
17  and it's another to sit across from a student and
18  test then in person. To see how they test, not
19  necessarily what the results are, but to see how
20  they test. And so Robert was, it was somewhat
21  laborious for him.
22      HEARING OFFICER KRAMER: Were your
23  findings different from the findings that were
24  presented to you?
25      MS. SUGARMAN: No, they were actually

44

1  commensurate. He scored at the second grade
2  level for the word attack; third grade level for
3  letter word attack on the Woodcock-Johnson and
4  the Woodcock-Johnson from October was third grade
5  level as well.
6      HEARING OFFICER KRAMER: Did you ever
7  personally observe the child in the classroom at
8  Winston?
9      MS. SUGARMAN: I observed him in his
10  Focus session.
11      HEARING OFFICER KRAMER: How many times?
12      MS. SUGARMAN: Once.
13      HEARING OFFICER KRAMER: When?
14      MS. SUGARMAN: This week.
15      HEARING OFFICER KRAMER: Are all of his
16  classes twelve?
17      MS. SUGARMAN: Yes. Excluding his math
18  class and if you'll just give me a moment I can
19  tell you; but it would be somewhere between ten
20  and twelve in his math class as well. If you'd
21  like me to look that up, I can.
22      HEARING OFFICER KRAMER: We like
23  accuracy, but it's about ten?
24      MS. SUGARMAN: Yes, ten to twelve.
25      HEARING OFFICER KRAMER: With respect to

22

46

1    MS. SUGARMAN: That's between the
2  bookkeeping department and the headmaster.
3    HEARING OFFICER KRAMER: I don't have
4  any further questions.
5    MR. PARENT: Let me just, I have follow
6  up.
7    HEARING OFFICER KRAMER: Just a moment,
8  do you have anything else? Okay. We have a
9  couple of more questions.
10    MR. PARENT: Yes.
11    MS. SUGARMAN: Okay.
12    MR. PARENT: I apologize if you've
13  already answered this question. But just to
14  clarify, do you have a speech and language
15  therapist on staff?
16    MS. SUGARMAN: We have about a dozen
17  speech and language therapists.
18    MR. PARENT: Okay. No further
19  questions.
20    MR. SINSHERMER: Thank you very much,
21  Beth.
22    HEARING OFFICER KRAMER: Hold on.
23    MR. SINSHERMER: I'm sorry.
24    HEARING OFFICER KRAMER: I have one, a
25  follow up to that question, which is, how often

45

1    your tuition, what is the arrangement with regard
2  to tuition; do you have any loan programs for
3  students?
4    MS. SUGARMAN: We have a payment
5  program. We have a Smart Payment Program. And
6  that's dependent upon the family as they wish to,
7  how they utilize that. I don't have that
8  information before me.
9    HEARING OFFICER KRAMER: Do you have any
10  loan programs?
11    MS. SUGARMAN: No, we do not.
12    HEARING OFFICER KRAMER: But Robert
13  hasn't paid any portion of his tuition, has he?
14    MS. SUGARMAN: I'm sorry?
15    HEARING OFFICER KRAMER: Robert hasn't
16  paid the tuition that was due?
17    MS. SUGARMAN: I would have to check
18  with the bookkeeper, I don't have; I'm not privy
19  to that information. I can get that for you, but
20  I don't have that before me.
21    HEARING OFFICER KRAMER: So you don't
22  know what will happen to him if he doesn't have
23  an immediate payment? That's not your purview?
24    MS. SUGARMAN: No, it's not.
25    HEARING OFFICER KRAMER: Okay.

23

47

1   does Robert receive speech and language therapy

2   at Winston?

3         MS. SUGARMAN: He currently is with a

4   reading specialist to help develop his

5   comprehension and decoding abilities.

6         HEARING OFFICER KRAMER: That wasn't my

7   question.

8         MS. SUGARMAN: I'm sorry.

9         HEARING OFFICER KRAMER: My question was

10   how often does he see a speech and language

11   therapist?

12         MS. SUGARMAN: He does not see one.

13         HEARING OFFICER KRAMER: Thank you.

14         MR. PARENT: I would like to follow up

15   on yours?

16         HEARING OFFICER KRAMER: Alright, go

17   ahead.

18         MR. PARENT: Why not?

19         MS. SUGARMAN: Well I was trying to

20   answer before that he's with a reading specialist

21   because of his decoding and comprehension

22   difficulties.

23         (END TAPE 080_335-A)

24         (START TAPE 080_335-B)

25         HEARING OFFICER KRAMER: We're back on

Ubiqus/Nation-Wide Reporting & Convention Coverage
22 Cortlandt Street – Suite 802, New York, NY 10007
Phone: 212-227-7440 * 800-221-7242 * Fax: 212-227-7524

48

1   the record.

2         MR. PARENT: Ms. Sugarman are you aware

3   that his last IEP, the October of '05 IEP had

4   speech and language as a related service?

5         MS. SUGARMAN: I don't have that in

6   front of me. I am not aware of that.

7         MR. PARENT: Okay, but is it mutually

8   exclusive for Robert to receive instruction from

9   a Reading Specialist and also receive speech and

10   language therapy?

11         MS. SUGARMAN: Well he is mandated to

12   receive speech and language therapy, but it's my

13   understanding; I may be incorrect, but being that

14   we are not a State Approved school, that we don't

15   necessarily have to provide that service here.

16   And that can be received through an independent

17   provider.

18         MR. PARENT: Are you saying your

19   providers are full or would not be able to pick

20   up Robert?

21         MS. SUGARMAN: I'm not saying that, I'm

22   saying that based upon our findings of his needs

23   as a student, that he was paired with a reading

24   specialist because that's what our understanding

25   of what his needs were, and that's why he was

Ubiqus/Nation-Wide Reporting & Convention Coverage
22 Cortlandt Street – Suite 802, New York, NY 10007
Phone: 212-227-7440 * 800-221-7242 * Fax: 212-227-7524

244

49

1  paired with a reading person.
2  MR. PARENT: Okay, thank you. No
3  further questions.
4  MR. SINSHERMER: I have one.
5  HEARING OFFICER KRAMER: Go ahead.
6  MR. SINSHERMER: Were you aware that
7  speech and language was provided on the last IEP?
8  MS. SUGARMAN: Not before, I was not
9  aware of that.
10  MR. SINSHERMER: And were you, and there
11  is no IEP for this year, is that correct? You
12  don't have one, do you?
13  MS. SUGARMAN: No, we do not.
14  MR. SINSHERMER: Thank you.
15  HEARING OFFICER KRAMER: I have another
16  question. Did you ever meet with the parent?
17  MS. SUGARMAN: I have not, personally,
18  no. The admissions director has.
19  HEARING OFFICER KRAMER: Alright, thank
20  you.
21  MR. SINSHERMER: Thank you very much,
22  Ms. Sugarman.
23  MS. SUGARMAN: Okay, thank you.
24  HEARING OFFICER KRAMER: Okay, anything
25  else from anybody?

50

1  MR. PARENT: I would like to comment on
2  the Exhibit regarding expenditures?
3  HEARING OFFICER KRAMER: Well it's not
4  going to be evidence unless you want to be sworn
5  in as a witness.
6  MR. PARENT: I'll swear.
7  HEARING OFFICER KRAMER: You want to be
8  a witness?
9  MR. PARENT: Yes.
10  HEARING OFFICER KRAMER: And who's going
11  to ask you questions?
12  MR. PARENT: I will.
13  MR. SINSHERMER: I'll ask them,
14  backwards.
15  HEARING OFFICER KRAMER: Do you want to
16  be sworn in?
17  MR. PARENT: Sure.
18  HEARING OFFICER KRAMER: Okay, and raise
19  your right hand. Do you swear or affirm that the
20  testimony you'll be giving today is true?
21  MR. PARENT: Yes.
22  HEARING OFFICER KRAMER: Okay.
23  MR. PARENT: Okay.
24  HEARING OFFICER KRAMER: And it what
25  capacity are you testifying?

51

1    MR. PARENT: In terms of my own personal
2   knowledge as an employee of the Department of
3   Education who has dealt with Impartial Hearing
4   Cases and cost issues.
5        HEARING OFFICER KRAMER: Okay.
6        MR. PARENT: Okay, I would just like to
7   comment on the Exhibit submitted by Mr.
8   Sinshermer regarding total per student spending
9   per Special Ed students for the '03-'04 school
10  year of $34,816. I would just like to note that
11  in my own investigation of the breakdown of
12  spending, this figure represents monies that
13  includes things like transportation and other
14  costs, that it as a comparison to straight
15  tuition it's kind of an apples and oranges
16  comparison. The $34,816 includes what might be
17  considered tuition, but all other costs as well,
18  lumped together.
19       HEARING OFFICER KRAMER: In addition to
20  transportation costs, what else is it?
21       MR. PARENT: Well from what I recall
22  they talk about custodial services, lunch, food
23  services, there's a whole list of different
24  things that they add up in terms of this figure.
25       MR. SINSHERMER: May I?

52

1        HEARING OFFICER KRAMER: Sure.
2        MR. SINSHERMER: Do you believe that
3   Winston serves lunch? That's part of their
4   tuition?
5        MR. PARENT: I don't know how they break
6   that down.
7        HEARING OFFICER KRAMER: He can't know
8   that.
9        MR. SINSHERMER: Well, do you think they
10  have lunch service there, custodial service?
11       MR. PARENT: I don't know.
12       MR. SINSHERMER: And what year was that
13  for, that $34,000?
14       MR. PARENT: '03-'04.
15       MR. SINSHERMER: Thank you very much.
16       MR. PARENT: Nothing else.
17       MR. SINSHERMER: Well I'd like to make a
18  little closing statement.
19       HEARING OFFICER KRAMER: Sure, you
20  certainly can.
21       MR. SINSHERMER: I think the behavior of
22  the Department of Education wit respect to this
23  child is absolutely unbelievable. Here's a
24  child, they changed his classification from
25  Emotional Disturbance to Speech and Language

26

54

1   HEARING OFFICER KRAMER: 59?

2       MR. SINSHERMER: 559. In which the

3   court in the southern district held while an IEP

4   devised by a school district must provide the

5   student with an education in the least

6   restrictive environment, as parent's inability to

7   place his child in the least restrictive

8   environment does not bar parental reimbursement.

9   And that cites a second circuit case which is, I

10  haven't got the citation, it does cite the second

11  circuit case. And I think that we've shown that

12  this is an appropriate placement. The child is

13  doing well. The child never did well in the

14  Public School System. The kid is in sixth grade,

15  reading at a third grade level. They've had him

16  for long enough and I think that it's time that

17  the parent had the opportunity to see this child

18  progress. That's it.

19      HEARING OFFICER KRAMER: Mr. Parent?

20      MR. PARENT: Yeah, so I would like to

21  raise in my own closing the LRE issue and to

22  oppose Winston on Prong 2; in addition to the

23  failure to provide speech and language therapy in

24  school at Winston Prep. So therefore the

25  Department opposes Winston Prep on Prong 2.

Ubiqus/Nation-Wide Reporting & Convention Coverage
22 Cortlandt Street - Suite 802, New York, NY 10007
Phone: 212-227-7440 • 800-221-7242 Fax: 212-227-7524

---

53

1   without an evaluation.

2       HEARING OFFICER KRAMER: Can you, I'm

3   just going to interrupt. I'd like you to really

4   stick to what's in the records.

5       MR. SINSHERMER: Okay.

6       HEARING OFFICER KRAMER: That

7   information, because I never heard any of that.

8   So it's not evidence. If you want to make a

9   closing it has to be based on the evidence that

10  I've heard.

11      MR. SINSHERMER: Yeah, well I think the

12  evidence, the evidence is quite clear. The

13  region has conceded Prong 1, Prong 2 I think has

14  been amply demonstrated by testimony both of the

15  parent and of the school. I would like to point

16  out a couple of things. I had a recent case

17  where the question of the least restrictive

18  environment has been raised. Even though it

19  wasn't raised in this case, I would like very

20  much to point the Hearing Officer's Direction to

21  a case called Giarabelle (phonetic) against

22  Arlington Central School District, 1418-Fed Sub

23  2, 2nd 559.

24      HEARING OFFICER KRAMER: End Sub 2nd?

25      MR. SINSHERMER: Yes,

Ubiqus/Nation-Wide Reporting & Convention Coverage
22 Cortlandt Street - Suite 802, New York, NY 10007
Phone: 212-227-7440 • 800-221-7242 Fax: 212-227-7524

56

# C E R T I F I C A T I O N

I, Erika Swyler, do hereby certify that I typed the transcript In the Matter of Robert Rios taken on October 4, 2006, by Nelson A. Bello at the offices of the Department of Education, and that to the best of my ability, this is an accurate transcription of what was recorded at that time and place.

*Erika Swyler*

ERIKA SWYLER, Transcriber

Ubiqu/Nation-Wide Reporting & Convention Coverage
22 Cortlandt Street - Suite 802, New York, NY 10007
Phone: 212-227-7440 * 800-221-7242 * Fax: 212-227-7524

---

55

1    That's all.

2        HEARING OFFICER KRAMER: Okay.

3        MR. PARENT: Yes.

4        MR. SINSHERMER: I can e-mail you.

5        HEARING OFFICER KRAMER:

6    jtkramer@aol.com. I'll read anything you send

7    me; anything that will help.

8        MR. SINSHERMER: Okay. I'll even send

9    you a copy.

10        (Whereupon, at 11:11 a.m. the proceeding

11    was adjourned.)

Ubiqu/Nation-Wide Reporting & Convention Coverage
22 Cortlandt Street - Suite 802, New York, NY 10007
Phone: 212-227-7440 * 800-221-7242 * Fax: 212-227-7524

28

# EXHIBIT C



# LEGAL SERVICES FOR CHILDREN, INC.

271 MADISON AVENUE • 17TH FLOOR • NEW YORK, NY 10016
TELEPHONE: (212) 683-7999 • FAX: (212) 683-5544

## FAX COVER SHEET

TO:  Judith T. Kramer                          FAX: 718-522-7376

FROM: Warren J. Sinsheimer                     212-683-7999 x 222

DATE: October 16, 2006

PAGES: 8 (Including cover)

RE: Robert Rios IH Casae#106010


Enclosed please find a copy of a Post Hearing Memorandum of Law in the above entitled matter.

Warren J. Sinsheimer


cc:  Mark Parent  Region 2


CONDFIDENTIALITY NOTE: This facsimile is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. Dissemination, distribution, or copying this facsimile or the information herein by anyone other than the intended recipient is prohibited.  If you have received this facsimile in error, please notify us immediately by telephone.

THE NEW YORK CITY DEPARTMENT OF EDUCATION
-------------------------------------------------------------------------X
IN THE MATTER OF

Gloria Rodriguez, on behalf of her son Robert Rios,

**POST HEARING MEMORANDUM OF LAW**

- against -

Impartial Hearing
Case No. 106010

New York City Department of Education,

IHO Judith T. Kramer

-------------------------------------------------------------------------X

## INTRODUCTION

Legal Services for Children, Inc. submits this Memorandum on behalf of Gloria Rodriguez, the mother of Robert Rios, and in support of her request that the Department of Education (DOE) be ordered to prepay the tuition of Robert Rios at the Winston Preparatory School for the 2006–2007 school year.

## FACTS

Robert was born on September 6, 1995. (R at 7)  He was classified Speech and Language before he started kindergarten in the New York City Public Schools. (R at 8).  The DOE failed to offer him a FAPE for the 2006-07 school year. (R at 4, 12).  Robert's mother applied to Winston Preparatory School for the 2006-07 school year, and, Robert was accepted after having been on the waiting list. (R at13, 14).The parent sustained her burden of proof with respect to "prong two" through the testimony of Ms. Beth Sugarman.  Ms. Sugarman is Director of Operations and Educational Research at the Winston Preparatory School. (R at 33).  Ms. Sugarman testified that Winston was an appropriate placement for Robert (R at37)   The DOE offered no evidence that Winston Preparatory School was not an appropriate placement for Robert.

2

Robert's mother testified that she never failed to cooperate with the CSE or the school authorities (R at 12) and that she never failed to go to a meeting when asked.. (R at 12).

## LEGAL STANDARDS

The Individuals with Disabilities Education Act (IDEA), recently reenacted as the Individuals with Disabilities Education Improvement Act of 2004, is designed to ensure that all children with disabilities are provided with a free appropriate public education (FAPE). See 20 U.S.C.A. § 1400(D)(1)(A) (Supp. 2005); Schaffer v. Weast, 126 S. Ct. 528, 531 (2005); Mackey ex rel. Thomas M. v. Bd. of Educ., 386 F.3d 158, 159–60 (2d Cir. 2004). In order to satisfy the requirements of the IDEA, a school district must provide each disabled child with "special education and related services," 20 U.S.C.A. § 1401(9) (Supp. 2005), that are "reasonably calculated to enable the child to receive educational benefits," Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982).

Under the standard set forth by the United States Supreme Court in School Committee of Burlington v. Department of Education, 471 U.S. 359 (1985), a board of education may be required to pay for educational services obtained by a parent for his or her child if: (1) the services offered by the board were inadequate or inappropriate; (2) the services obtained by the parent were appropriate; and (3) equitable considerations support the parent's claim. Id. at 370, 374. When the three Burlington prongs are satisfied, parents who have unilaterally placed their child in a private school may obtain reimbursement for the cost of the private school tuition. See Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 12 (1993); Burlington, 471 U.S. at 369. The fact that a parent has chosen an educational program not approved by the state, rather than one known to be state-approved, is not itself a bar to reimbursement. Carter, 510 U.S. at 14. The private school need not employ certified special education teachers and need not prepare its

2

3

own Individualized Education Program (IEP) for the student. <u>Application of a Child with a Disability</u>, Appeal No. 03-066.

The facts of this case satisfy all three <u>Burlington</u> prongs, entitling Ms. Rodriguez to payment for the cost of her son's attendance at the Winston Preparatory School for the 2006–2007 school year.

## ARGUMENT

### I.     THE NEW YORK CITY DEPARTMENT OF EDUCATION (DOE) FAILED TO PROVIDE ROBERT WITH A FAPE.

In order to provide a student with a FAPE, a board of education must: (1) comply with the procedural requirements set forth in the IDEA; and (2) develop an IEP that is reasonably calculated to enable the student to receive educational benefits. <u>See</u> <u>Rowley</u>, 458 U.S. at 206–07. The facts of Robert's case satisfy the first <u>Burlington</u> prong because the DOE admitted that it did not provide a FAPE. (R at 4) .

### II.    THE WINSTON PREPARATORY SCHOOL IS AN APPROPRIATE PLACEMENT FOR ROBERT

In order to obtain tuition reimbursement under <u>Burlington</u>, parents must demonstrate the appropriateness of the private school in which they have placed their child. An appropriate school is one that provides services "proper under the Act," <u>Carter</u>, 510 U.S. at 15; <u>Burlington</u>, 471 U.S. at 370, i.e. one that offers an educational program that meets the child's special education needs, <u>Application of a Child with a Disability</u>, Appeal No. 05-039; <u>Application of a Child with a Disability</u>, Appeal No. 01-010. In assessing whether a parent has satisfied the second <u>Burlington</u> prong, it must be borne in mind that "[t]he test for a parental placement is that it is appropriate, not that it is perfect." <u>Application of a Child with a Disability</u>, Appeal No. 05-075 (citing <u>Warren G. v. Cumberland County Sch. Dist.</u>, 190 F.3d 80, 84 (3d Cir. 1999)).

4

Petitioner met her burden of demonstrating the appropriateness of Robert's placement at the Winston Preparatory School and thus satisfied the second Burlington prong.

The record contains categorical and uncontorverted testimony that Winston Preparatory School is an appropriate placement for Robert. (R at 35).

Robert's placement at the Winston Preparatory School is consistent with the LRE requirement.    While this requirement bears on the appropriateness of parents' unilateral placement of their child in a private school, "parents seeking an alternative placement may not be subject to the same mainstreaming requirements as a school board." M.S. ex rel. S.S. v. Bd. of Educ., 231 F.3d 96, 105 (2d Cir. 2000).  In addition, "[a]n appropriate private placement is not disqualified because it is a more restrictive environment than that of the public placement." Warren G., 190 F.3d at 84; see also Rose v. Chester County Intermediate Unit, 1996 WL 238699, at *9 (E.D. Pa. 1996) (concluding that LRE requirement "does not make sense in the context of parental placement" because "the problem that Congress sought to eliminate . . . [with that requirement was] public schools' exclusion of disabled children").

. Under the case law, no the parent does not have the burden of establishing that placement she has found for her child is the least restrictive environment. The LRE requirement must be "balanced against the requirement that each student with a disability receive an appropriate education," Application of a Child with a Disability, Appeal No. 03-066 (citing Briggs v. Bd. of Educ., 882 F.2d 688, 692 (2d Cir. 1989)); Application of the Bd. of Educ. of the Guilderland Cent. Sch. Dist., Appeal No. 01-059 (citing Briggs), and the DOE has not provided Robert *any* valid educational placement for the 2006–2007 school year. The United States Court of Appeals for the Second Circuit recently decided: "...parents are not barred from reimbursement where a private school they chose does not meet the IDEA definition of a Free

4

5

Appropriate Public Education." Anthony G v. Board of Education of Hyde Park, Central School District; Docket No. 04-4981-cv.   The court further stated that "An appropriate private placement need not meet state education requirements...In addition, parents 'may not be subject to the same mainstreaming requirements as a school board'" Id at 10, 11

The United States District Court for the Southern District of New York recently ruled: "... while an IEP devised by a school district must provide the student with an education in the least restrictive environment, a parent's inability to place his child in the least restrictive environment does not bar parental reimbursement."   Gagliardo v. Arlington Central School District 418 F. Supp 2d 559 (citing M.S. 231 F3d at 105).

The Impartial Hearing Officer suggested that because Robert has been at Winston for such a short time, it may be difficult to establish that Winston was an appropriate placement for him. The question of whether an IEP is valid is a *prospective* analysis rather than a *retrospective* one has been decided in the First, Third and Ninth Circuits see: Roland M. v. Concord School Comm., 910 F2d 983, 992 (1st Cir. 1990): Carlisle Area Sch. v. Scott P., 63 F.3d 520, 530: and Adams v. Oregon, 195 F.3d 1141, 1149 (9th Cir. 1999).   Each of these circuits held that "the inquiry into whether an IEP is valid is necessarily a *prospective* analysis, and that consideration of proof of whether an IEP meaningfully contributed to the child's education is not altogether proper".   D.F. and D.F. v. Ramapo Central School District 430 F. 3d. 595. (2nd Cir 1995).

Clearly, the question of the measurement of the appropriateness of a private school placement is analogous.   The placement looks *prospectively*.   Is the placement one which will give the child an appropriate education?   That is question which is to be asked.   In this case the answer is "yes".

A further reason to look forward to ascertain the appropriateness of the placement for Robert is the financial situation on the parent. Ms. Rodriguez cannot afford to prepay the tuition at Winston Preparatory School (R at 16). If she is not awarded prospective payment of the Winston tuition, Robert will not be able to attend. Ms. Rodriguez could not have waited until there were results from Robert's Winston experience. If she had – there would have been no Winston experience! The Connors case clearly had this kind of dilemma in mind when it established the right of poor people to enjoy the same advantages as the wealthy in the payment of tuition for their disable children. See Connors v. Mills 34 F. Supp 2d. 795.

## III.    THE EQUITIES FAVOR THE PARENT.

For the school year at issue this case, the DOE failed to conduct a CSE meeting in accordance with Federal and State Law. Consequently the DOE completely failed to provide Robert with a FAPE. Undisputedly there was not any uncooperativeness on the part of Ms. Rodriguez which caused this problem with respect to the 2006-2007 school year. As such, equitable considerations clearly weigh in Ms. Rodrigeuz's favor. See Application of the Bd. of Educ. of the City Sch. Dist. of the City of Buffalo, Appeal No. 05-030 ("In the absence of evidence demonstrating that the parents failed to cooperate in the development of the IEP or otherwise engage in conduct that precluded the development of an appropriate IEP, equitable considerations generally support a claim of tuition reimbursement." (citation omitted)); Application of the Bd. of Educ. of the Springville-Griffith Inst. Cent. Sch. Dist., Appeal No. 02-036 (finding that, absent showing that parents interfered with school district's ability to have IEP in place at beginning of school year, equitable considerations did not bar award of tuition reimbursement); cf. Warren G., 190 F.3d at 86 (concluding that Carter does not sanction denying parents "arbitrary fraction of reimbursement" where parents' conduct did not prevent district

6

7

from preparing appropriate IEP); id. ("In those circumstances it makes little sense to determine the amount of reimbursement not with reference to what is required by the IDEA to provide an appropriate education but by comparing the conduct of the school district with that of the parents . . . .").

## CONCLUSION

In sum, since the DOE admittedly failed to provide Robert with a FAPE, and since Ms Rodriguez placed Robert in an appropriate school and equitable considerations clearly weigh in Ms. Rodriguez's favor, Ms. Rodriguez is entitled to pre-payment for the cost of Robert's attendance at the Winston Preparatory School during the 2006–2007 school year.

Ms. Rodriguez satisfies the test for tuition reimbursement set forth by the Supreme Court in Burlington and Carter, entitling her to payment for the cost of Robert's tuition at the Winston Preparatory School..   The DOE's failure to provide him with a valid IEP and an appropriate school placement are flagrant violations of federal and state law.  Ms. Rodriguez's decision to enroll Robert in the Winston Preparatory School was a reasonable response to the DOE's complete abdication of its duty to provide him with a FAPE, and equitable considerations warrant that his attendance costs at Winston Preparatory School paid by the DOE.

Dated: September 19, 2006          LEGAL SERVICES FOR CHILDREN, INC.

Attorneys for Robert Rios

BY:          WARREN J. SINSHEIMER
271 Madison Avenue, 17th Floor
New York, New York 10016
(212) 683-7999 x 222

TRANSMISSION REPORT

Judith
Kramer

| | | | | TIME | :10-16-'06 10:19 |
| | | | | FAX NO.1 | : |
| | | | | NAME | : |

| NO. | FILE NO. | DATE TIME | DURATION | PGS | TO | DEPT | MODE | STATUS |
|-----|----------|-----------|----------|-----|-----|------|------|--------|
| 614 | 808 | 10.16 10:18 | 01:04 | 8 | 17185227376 | | EC 603 | OK |

9

TRANSMISSION REPORT

T360SY0U370                    F562-A06
TIME          :10-16-'06 10:21
FAX NO.1      :
NAME          :

| NO. | FILE NO. | DATE TIME | DURATION | PGS | TO | DEPT | MODE | STATUS |
|-----|----------|-----------|----------|-----|-----|------|------|--------|
| 615 | 809 | 10.16 10:20 | 00:53 | 8 | 17187947469 | | EC 603 | OK |

10

# EXHIBIT D

## FINDINGS OF FACT AND DECISION

Case Number:              106010

Student's Name:           Robert Rios

Date of Birth:            September 6, 1995

District:                 11

Hearing Requested By:     Parent

Date of Hearing:          October 4, 2006

Hearing Officer:          Judith T. Kramer, Esq.

Hearing Officer's Findings of Fact and Decision                                    1
Case 1:07-cv-04711-TPG    Document 10-3    Filed 12/10/2007    Page 49 of 80
Case No. 106010

## NAMES AND TITLES OF PERSONS WHO APPEARED

| | | |
|---|---|---|
| Warren Sensheimer | Attorney | Parent |
| Gloria Rodriguez | Mother | |
| Beth Sugarman | Director of Operations, Winston Preparatory School | Parent |
| Mark Parent | Chairperson Designee, CSE, | |

Hearing Officer's Findings of Fact and Decision 2

Case No. 106010

## INTRODUCTION

On October 4, 2006, an impartial hearing was commenced pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. 1415 (f) regarding a parental request for Conners tuition payments for Robert R. ("the child ") for the 2006-2007 school year. The hearing was held at the Impartial Hearing Office of the Board of Education of the City of New York located at 131 Livingston Street, Brooklyn, New York. The hearing commenced at 10:00 a.m. A list of exhibits that were admitted into evidence is attached to this decision.

## BACKGROUND

The last placement recommended by the Committee on Special Education ("CSE") as reflected in the child's IEP dated October 7, 2005 ("IEP") is that the child attend a ten month program in a special class with a class ratio of 12:1:1 with the following related services: 1) speech and language, 3:1, 2x30 and 2) counseling, 3:1, 1x30. Id. (Parent's Exhibit 1) On the IEP, the child's classification is still designated as speech and language impaired. Id.

The child was attending P.S. 96 during the 2005-2006 school year. At that time, the parent was not satisfied with P.S. 96 and she decided to look for a new placement for the child. The child's teacher recommended a charter school—P.S 135. The parent did not pursue this recommendation. However, she did not receive any further recommendations for placements from the district for the 2006-2007 school year. In addition, no CSE meeting was held in the spring or summer of 2006 to determine a proper placement for the child. The parent decided to unilaterally place the child in a non-approved private school, Winston Preparatory School ("Winston") for which she now seeks Connors tuition payments.

## THE PARENT'S POSITION

The parent contends that the Department of Education ("DOE") failed to provide the child with a Free Appropriate Public Education ("FAPE") for the 2005-2006 school year. She further contends that: 1) her unilateral placement of the child at Winston was appropriate, 2) she cooperated with the DOE and 3) she cannot afford to pay the tuition

3

for Winston and needs financial assistance pursuant to <u>Connors</u> for her child to continue there.

**THE BOARD'S POSITION**

The District concedes that it did not offer the child a FAPE for the 2006-2007 school year. However, it contends that Winston is not an appropriate placement for the child and thus, the parent is not entitled to <u>Connors</u> relief.

**THE EVIDENCE PRESENTED**

The child is ten years old. When the child was in pre-school at the Rainbow School, he was classified as speech and language impaired and received speech and language services there. (Parent's Exhibit 2) He was reevaluated in December 1999 when he aged out of preschool and was then classified as learning disabled and given speech and language services. <u>Id.</u> In March 2001, a request was made to add counseling. <u>Id.</u> He was also receiving therapy for his panic attacks at Astor Child Guidance Center. Id. in 2002, his school attendance was fair/poor. <u>Id.</u>

At the time of the 2002 evaluation, child was attending P.S. 96 and was in the second grade in a special class with a class ratio of 12:1:1 and he received counseling and speech and language services. <u>Id.</u> He was receiving speech and language therapy. <u>Id.</u> The evaluation was requested by the parent who was dissatisfied with the child's academic performance. <u>Id.</u> Nonetheless, the child remained at P.S. 96 until the end of the fifth grade. (Parent's Exhibit 3) He was evaluated once again in September 2005 as part of a triennial review. <u>Id.</u> It was noted that the child spoke in a very low volume but has made significant progress in all aspects of reading, including comprehension and decoding. <u>Id.</u> His math skills were found to be weaker than his reading skills. <u>Id.</u> His oral language and auditory comprehension was found to be below expected levels. <u>Id.</u>

The placement recommended by the CSE as reflected in the child's IEP dated October 7, 2005 ("IEP") is that the child attend a ten month program in a special class with a class ratio of 12:1:1 with the following related services: 1) speech and language, 3:1, 2x30 and 2) counseling, 3:1, 1x30. <u>Id.</u> (Parent's Exhibit 1) On the IEP, the child's classification is still designated as speech and language impaired. <u>Id.</u>

Case 1:07-cv-04711-TPG    Document 10-3    Filed 12/10/2007    Page 52 of 80
4
Hearing Officer's Findings of Fact and Decision
Case No. 106010

The child remained at P.S. 96 until the end of the 2005-2006 school year when the child completed the fifth grade. At that time, the parent was not satisfied with P.S. 96 and she decided to look for a new placement for the child. (T. 10) The child's teacher advised her that the child could now be placed in a general education class and she recommended a charter school. (T. 11) The parent did not pursue this teacher's recommendation. Id. The parent testified that she cooperated with the DOE throughout the school year. (T. 12) However, she did not receive any further recommendations for placements from the DOE for the 2006-2007 school year. Id. In addition, no CSE meeting was held in the spring or summer of 2006 to determine a proper placement for the child. (T. 18) The parent decided to unilaterally place the child in a non-approved private school, Winston Preparatory School ("Winston") for which she now seeks Connors tuition payments. (T. 13)

The parent testified that the child is "happy at Winston" and that the classes are easy for him. (T. 14) He can do the homework. (T.15) However, she testified that she has had only two conversations with his teachers since his placement there in September and that the teachers have not advised her of the child's academic achievements. (T. 21)

The tuition at Winston is $38,750 per year. (Parent's Exhibit 4). The parent presented evidence that the tuition is reasonable based upon the DOE own expenditures per pupil at reflected on its website. (Parent's Exhibit 7) The parent further testified that her expenses—not including food and clothing – are about $1,000 per month for rent, telephone and cable. Her annual income from her salary is $35,000 per year and that the child receives an additional $7,200 per year from SSI. (Parent's Exhibit 6, T. 26) She owns no real property and does not have an automobile. She has not been able to pay any of the tuition on her own but has received a loan from the Fairness Fund based upon an application given to her by Winston. Winston has told the parent "not to worry" about the payments. (T. 29, 31)

Beth Sugarman testified that she was the Director of Operations and Educational Research for Winston. She has a master's degree and is a speech and language pathologist. (T. 33) She has worked at Winston for 9 years and oversees the placement at

Winston. She testified that the child started at Winston in September 2006. (T 34)She did not do the testing of this child but is convinced that Winston is an appropriate placement for the child. (T. 35) Her opinion is based upon one observation of the child, a conversations with Peter Hill, one of the child's teachers, and a conversation with the child's FOCUS teacher who told her that the child has recently begun to participate in class and that "he needs a lot of repetition and information to be presented in slowly and broken down on a consistent basis". (T. 38)

Ms. Sugarman testified that the testing done at Winston was done by the Admissions Director. (T. 42) She also stated that the testing done at Winston confirmed the testing that was previously done of the child during prior evaluations. (T. 43-44) She testified that she did not have the IEP in front of her and that she is unaware that the IEP requires that the child receive speech and language therapy. (T. 48) Thus, although Winton has twelve speech and language therapists on staff, the child is not currently receiving any speech and language therapy as part of his educational program there. (T. 46, 47) She testified that such therapy should be provided to the child elsewhere.(T. 48)

## CONCLUSIONS OF LAW

Both the IDEA, state law and regulations require that each and every disabled child be provided a FAPE in the least restrictive environment ("LRE") appropriate to meet their individual needs. 20 U.S.C. § 1412 (a)(1)(A); 1412 (a)(5)(A); 34 CFR § 300.550(b); 8 NYCRR § 200.4 (c)(4); 8 NYCRR § 200.6 (a)(1). Nonetheless, where as here, the parent has filed a request for relief, the parent bears the burden of persuasion to show that they are entitled to the remedy they seek. Schaeffer v. West, 546 U.S.---(2005).

First, the parent bears the burden of persuasion to show that the DOE failed to provide the child with a FAPE. If that burden is met, a board of education may be required to pay for educational services obtained for the child by her parent if the parent is able to show that the services selected by the parent is appropriate. If the parents' placement is appropriate, reimbursement will only be granted if, when equitable considerations are factored in, it is determined the cost of reimbursement is appropriate and reasonable. School Committee of the Town of Burlington v. Department of

Case 1:07-cv-04711-TPG    Document 10-3    Filed 12/10/2007    Page 54 of 80
Hearing Officer's Findings of Fact and Decision                                    6
Case No. 106010

Education, 471 U.S. 359, 370 (1985); Florence County School District Four v. Carter, 510 U.S.7 (1993). The parents bear the burden of establishing that the cost is reasonable. Schaffer v. Weast, 546 U.S.—(2005). The amount of reimbursement is discretionary, and "total reimbursement will not be appropriate if the court determines that the cost of the private education was unreasonable." Florence County, 510 U.S. at 16. The parent also bears the burden of persuasion to show that equitable considerations for the reimbursement she seeks favors her. Schaffer v. Weast,

In this case, the District's has conceded that it did not offer the child a FAPE in the LRE for the 2006-2007 school year. It contends however, that the parent's placement of the child is not appropriate. Thus, the parent bears the burden of persuasion to show that Winston is an appropriate placement for the child. Id., [See also, Application of a child with a disability, Appeal No. 05-008] In order to meet that burden, the parent must show that Winston offered an educational program that met the student's special education needs. [Burlington, 471 U.S. at 370; Application of a child with a Disability, Appeal No. 05-008; Application of a child with a Disability, Appeal No. 02-027] To qualify for tuition payments under the IDEA, parents need not show that a private placement furnishes every special service necessary to maximize their child's potential but they must demonstrate that the placement provides "educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction." Rowley, 458 U.S. at 188-89; Frank G. v. Board of Education of Hyde Park, 2006 WL 2077009 (2d Cir.) Nor as the parent's attorney correctly pointed out in his memorandum of law does the private placement have to be the LRE. Rose v. Chester County Intermediate Unit, 1996 WL 238699, at 9 (E.D. Pa. 1996), Application of Child with a Disability, Appeal No. 03-066 (citing Griggs v. Bd. of Education, 882 F.2d 688, 692 (2d Cir. 1989). However, the parent's contention that "proof of whether an IEP meaningfully contributed to the child's education is not altogether proper" is not particularly relevant here. In the instant case, the DOE has conceded prong one. Therefore, the focus here is no longer upon the IEP as the instrument that is designed to bestow a meaningful educational benefit but rather upon

the new placement itself. Thus, it is the parent's burden to show that the placement that she has chosen is designed to provide or is providing meaningful educational benefit.

Only if the Burlington prerequisites are shown can a parent receive prospective relief. Connors v. Mills, 34 F. Supp. 795 (NDNY 1998). In this case, as demonstrated below, the parent has failed to show on the evidence presented that the placement she has unilaterally chosen is appropriate failing to satisfy one of the Burlington prerequisites.

While no one factor is necessarily dispositive in determining whether the parent's unilateral placement is appropriate it must be "reasonably calculated to enable the child to receive educational benefits" prior to granting tuition payments, Rowley, 458 U.S. at 207. As such, grades, test scores, and regular advancement may constitute evidence that a child is receiving educational benefit...." Frank G. v. Board of Education of Hyde Park, 2006 WL 2077009 (2d Cir.) In Connors, the child had been in the placement for which the parent was seeking reimbursement for nine months before the school district agreed to settle the case with the parent. It is unclear from the discussion in the Court's decision in Connors if the district would have or could have settled if it was unconvinced that the Montessori school which the child was attending was providing a meaningful educational benefit to the child.

In this case, the parent placed the child at Winston in September 2006. At the time of the hearing, she was unable to offer any proof that child had made any tangible progress at Winston during the first month of school. In fact, she had not received any reports of academic progress from his teachers. She offered no documentary evidence and no testimony from his teachers about the child's progress. This undoubtedly due to the fact that he has not been in the placement long enough to make such an assessment. Nonetheless, the absence of such evidence is critical to this determination. Moreover, the only other witness presented by the parent, Ms. Sugarman, did not personally test the child and only observed the child once. She did not give any meaningful testimony regarding the child academic progress. Thus, her conclusory statement that she was convinced that the placement of the child at Winston is appropriate is not persuasive at this time. The only sliver of light shed on this issue by Ms. Sugarman was her testimony

Hearing Officer's Findings of Fact and Decision
Case 1:07-cv-04711-TPG    Document 10-3    Filed 12/10/2007    Page 56 of 80
8
Case No. 106010

that the child has begun participating in class while he was initially too shy to do so. This evidence is too thin without more to grant an award of tuition payments.

In addition, throughout the child's academic career as shown in the two evaluations which the parent did offer into evidence as well as her own testimony that the child has been receiving speech and language therapy since pre-school, it is abundantly clear that a primary educational need of the child as been and continues to be speech and language therapy. Ms. Sugarman testified that all of the testing given to the child by Winston staff confirmed all of the prior test findings. Notwithstanding that testimony, she never knew that the child's IEP mandated speech and language therapy for the child and was unaware of the child's need for speech and language therapy. Given that there are twelve speech and language therapists on staff at Winston, the child should be, but has not been offered, speech and language therapy as part of his educational program there. The absence of a service may not automatically mean that the placement is inappropriate. However, where, as here, the child is not receiving a related service which he has been receiving since pre-school, the absence of speech and language from his current program is significant in the determination of whether Winston is appropriate. This is true particularly where there has been no evidence offered by the parent to show that the child no longer needs this service. Thus, the absence of speech and language therapy from the child's program at Winston was also a factor considered in reaching the determination that the program the child is receiving at Winston is not appropriate.

Although the parent has demonstrated that: 1) she has continually cooperated with the DOE, 2) the tuition at Winston is reasonable and thus, the equities favor the parent, I am denying the parent's request for Connors tuition payments at this time. It is apparent that the child will be able to continue at Winston for the immediate future even though the parent is clearly in need of financial assistance. However, Connors relief may not be granted because the parent has failed to establish that the child's placement at Winston is appropriate. Such denial is, of course, without prejudice and may be renewed after the child has been at Winston for a longer period of time when the parent may be in a better

Hearing Officer's Findings of Fact and Decision
Case 1:07-cv-04711-TPG    Document 10-3    Filed 12/10/2007    Page 57 of 80
Case No. 106010

position to present evidence that Winston is providing the child with educational benefits and is thus, appropriate for the child.

Based upon the forgoing reasons, it is ordered that the parent's request for Conners relief as well as for tuition payments of any kind is denied without prejudice.

Dated: October 23, 2006

*Judith T. Kramer, Esq.*

JUDITH T. KRAMER, ESQ.
Impartial Hearing Officer

JTK:nn

## PLEASE TAKE NOTICE

Within 35 days of the date of this decision, the parent and/or the New York City Department of Education has a right to appeal the decision to the State Review Officer of the New York State Education Department under Section 4404 of the Education Law and the Individuals with Disabilities Education Act.

"The notice of intention to seek review shall be served upon the school district not less than 10 days before service of a copy of the petition for review upon such school district, and within 25 days from the date of the decision sought to be reviewed. The petition for review shall be served upon the school district within 35 days from the date of the decision sought to be reviewed. If the decision has been served by mail upon petitioner, the date of mailing and the four days subsequent thereto shall be excluded in computing the 25- or 35-day period." (8NYCRR279.2[b]) Failure to file the notice of intention to seek review is a waiver of the right to appeal this decision.

Directions and sample forms for filing an appeal are included with this decision. Directions and forms can also be found in the Office of State Review website: www.sro.nysed.gov/appeals.htm.

10

## EXHIBIT LIST

### Parent's Exhibits

1- IEP dated 10/7/05, 14 pp.

2- Educational Evaluation dated 9/26/02, 6pp.

3- Psycho-educational evaluation dated 9/19/05, 4pp.

4- Enrollment Agreement for Winston Preparatory School, 1p.

5- Letter to Region 2 dated 8/17, 2006, 1p.

6- US Income tax return dated 2005, 5pp.

7- Internet document from DOE website re: public school expenditures, 1p.

# EXHIBIT E

**THIS IEP INCLUDES:**
☐ Transition
☐ Interim Service Plan

# NEW YORK CITY
# BOARD OF EDUCATION

## INDIVIDUALIZED EDUCATION PROGRAM

**CONFERENCE INFORMATION**

CSE Case# 11-33880

Home District 11    Service District 11

Date 10-07-05

Type ER

## STUDENT INFORMATION

Name ROBERT RIOS    NYC ID# 268-366-903    Date of Birth 9/6/1995    *Age as of the date of the conference.    Gender MALE    *Age* 10

Address 679 WARING AVENUE APT. 4H BRONX, NY 10467

Phone (718) 654-5220    English LAB _____ Year    Spanish LAB _____ Year    Grade FOURTH

Language(s) Spoken/Mode of Communication    ENGLISH

Primary Agency with whom student is involved    NONE

Name of Contact _____    Phone _____    Agency Case # _____

## PARENT/GUARDIAN INFORMATION

Name GLORIA RODRIGUEZ    Relationship to Student MOTHER

Address 679 WARING AVENUE APT. 4H BRONX, NY 10467

Phone (Home) (718) 654-5220    Phone (Work) _____    Interpreter Required    ☐ Yes  ☒ No

Preferred Language/Mode of Communication    ENGLISH

## SPECIAL MEDICAL/PHYSICAL ALERTS    (Refer to Health & Physical Development Page for additional details.)

The student has ☐ medical conditions and/or ☐ physical limitations which affect his/her ☐ learning ☐ behavior and/or ☐ participation in school activities.

The student requires ☐ medication and/or ☐ health care treatment(s) or procedure(s) during the school day.

Other alerts: _food allergys : sea food milk products . chocolate_

## SUMMARY OF RECOMMENDATIONS

Recommended Services    Eligibility    ☒ Yes  ☐ No    Classification of Disability _Speech and language impairment_

_Special Class with related services_

Twelve Month School Year    ☐ Yes  ☒ No    Recommended Services for the Twelve Month School Year    _12:1:1_    Staffing Ratio

_____    Staffing Ratio

**Other Recommendations (Check all that apply)**

☐ Program Accessibility*    ☐ Bilingual Instruction    *Details are provided in relevant sections of IEP.

☑ Adaptive Phys. Ed.*    ☐ Monolingual Services with ESL

☑ Related Services*    ☐ Monolingual Services without ESL

☐ Assistive Technology*

☐ Special Education Transportation - Comment _____

**Students who are deaf or hard of hearing:**

Language of Instruction

Mode of Communication

**Students who are blind or visually impaired:**

Braille instruction needed    ☐ Yes  ☒ No

Copy for  ☐ CSE  ☐ PARENT  ☐ SCHOOL  ☐ STUDENT  ☐ OTHER

Student  ROBERT RIOS

NYC ID# 268-366-903    CSE # 11-33880    Date of Conference  Oct. 7, 2005

# CONFERENCE INFORMATION

| Referral Type: | ☐ Initial | ☐ Annual Review | Conference Type: | ☑ EPC | ☐ Annual Review |
| | ☑ Triennial | ☐ Requested Review | | ☐ CSE Review | ☐ CPSE Review |

**Attendance at Conference**

Please note that your signature reflects your participation at the conference and does not necessarily indicate agreement with the Individualized Education Program.

| Signature/Title | Role (Indicate if Bilingual) | Signature/Title | Role (Indicate if Bilingual) |
|---|---|---|---|
| *Gloria Rodriguez* | Parent/Legal Guardian | | Parent/Legal Guardian |
| | District Representative | *Leon Valdez* | Special Education Teacher or Related Service Provider |
| | General Education Teacher | | Parent Member (CPSE/CSE) *Guidance Counselor 10-7-05* |
| | Student | *Ruth Kennedy* | Other |
| | Education Evaluator | | Other |
| | School Psychologist | | Other |
| *Michele Gestalt* | School Social Worker | | Other |

Use an asterisk (*) to signify the participant who interprets the instructional implications of evaluation results.
Use the letter (T) to signify participation by teleconference.

**Conference Result**

| Indicate Modifications | ☐ Initiate Service | ☐ Modify Service | ☐ Change Recommended Service | ☐ No Change |

**Initiation, Duration and Review of IEP**

| Projected Date of Initiation of IEP | 10/7/05 | Projected Date of Review of IEP | 10/7/06 |
| Duration of Services | one year | | |

**Contacts with Parent/Legal Guardian**

| Date Notice of Meeting Sent | September 23, 2005 | Date IEP and Notice of Recommendation | |
| Date of Follow-up (if any) | Oct 3, 2005 | ☐ Given to Parent | |
| Type of Follow-up | ☐ Letter  ☐ Telephone | ☑ Sent to Parent | Oct. 14, 2005 |

Student _Robert Rios_

CSE # 11-33880

NYC ID# 267-366-903

Date of Conference _10-07-05_

10-07-05

## ACADEMIC PERFORMANCE AND LEARNING CHARACTERISTICS

Describe the student's present levels of academic achievement, language development, cognitive development and learning style. In English and the other than English language (for LEP students). Discuss how the student's disability affects his/her involvement and progress in the general curriculum or, for preschool students, as appropriate, how the student's disability affects participation in appropriate activities.

PRESENT PERFORMANCE: _Robert a quick forward shy youngster presents_
_with difficulties with skills in the general high level thinking skills_
_and global difficulties. Primary of basic concepts in his middle_
_cognitive processes in all areas of weakness include decoding_
_of comprehension with skills of more delayed expressive_
_writing skills are below grade expectancy._

### READING and WRITING

| Area | Date | Test/Evaluation | Score | Instructional Level |
|------|------|-----------------|-------|---------------------|
| Decoding | 9/1/05 | Woodcock Johnson 3 | 3.3 | Third grade |
| Reading Comprehension | 9/19/05 | Woodcock Johnson 3 | 3.1 | End of 3rd grade |
| Listening Comprehension | 9/19/05 | Woodcock Johnson 3 | 2.1 | Beginning 2nd grade |
| Writing | 9/19/5 | Writing sample | 2.5 | 2nd grade grade |

### MATH

| Area | Date | Test/Evaluation | Score | Instructional Level |
|------|------|-----------------|-------|---------------------|
| Computation | 9/19/05 | Woodcock Johnson-3 | 2.4 | 2nd grade |
| Problem Solving | 9/19/05 | Woodcock Johnson-3 | 1.6 | 1st grade level |
| ORAL Comprehension | 9/19/05 | Woodcock Johnson-3 | 3.2 | 3rd/4th level |

### ACADEMIC MANAGEMENT NEEDS
(Environmental modifications and human/material resources)

_Robert continues to need a self-contained classroom_
_to help develop math skills, oral language skills and_
_of expressive writing ability. Work habits need improvement_

Page 3

25-6500.03.7 (Rev. 10/98)

3

Student  Robert Rios                 NYC ID# 268-366-903    CSE # 11-33820    Date of Conference  10.07.05

# SOCIAL/EMOTIONAL PERFORMANCE

Describe the student's strengths and weaknesses in the area of social and emotional development in English and the other than English language for LEP students.
Consider the degree and quality of the student's relationships with peers and adults, feelings about self and social adjustment to school and community environments.
Discuss how the student's disability affects his/her involvement and progress in the general curriculum or, for preschool students, as appropriate, how the student's disability affects participation in appropriate activities.

**PRESENT PERFORMANCE:**

Robert is a friendly youngster who tends to be shy usually with adults. Difficulties with self-esteem and feelings of inadequacy surface and prevent Robert responding orally in class and performing his best.

**BEHAVIOR AND THE INSTRUCTIONAL PROCESS**

☐ Behavior is age appropriate.

☒ Behavior does not seriously interfere with instruction
and can be addressed by the ☐ general education
and/or ☐ special education classroom teacher.

☐ Behavior seriously interferes with instruction and
requires additional adult support.

☐ Behavior requires highly intensive supervision.

Describe present levels of support including personnel
responsible for providing behavioral support.

Special Education Teacher
Related Service Providers
Counselor

## SOCIAL/EMOTIONAL MANAGEMENT NEEDS
(Environmental modifications and human/material resources)

Group Counseling to help improve self-esteem as well as
promotion of academic growth.

A behavior intervention plan has been developed.    ☐ Yes    ☐ No

Page 4

CSE

4

Student __Robert Rios__    NYC ID# 268-366-903    CSE # 11-33,880    Date of Conference 10-07-05

# HEALTH AND PHYSICAL DEVELOPMENT

Describe the student's health and physical development including the degree or quality of the student's motor and sensory development, health, vitality and physical skills or limitations which pertain to the learning process, behavior and participation in physical education or other school activities. Discuss how the student's disability affects his/her involvement and progress in the general curriculum or, for preschool students, as appropriate, how the student's disability affects participation in appropriate activities.

## PRESENT HEALTH STATUS AND PHYSICAL DEVELOPMENT:

_Robert has food allergies to milk and peanut and_
_distress. He uses the pump for methylin as_
_needed at time._

## MEDICAL/HEALTH CARE NEEDS

During the school day, the student requires:

Medication ☐ Yes ☑ No
(If yes, functionally describe the condition for which medication is required.)

Treatment(s) or other health procedure(s) ☐ Yes ☐ No
(If yes, functionally describe the condition for which treatment(s) or procedure(s) are required.)

Health as a related service ☐ Yes ☑ No
(If yes, specify in related service recommendations.)

## PHYSICAL NEEDS

The student ☐ does ☑ does not have mobility limitations.
(If yes, functionally describe the limitation(s).)

The student requires:

Accessible program ☐ Yes ☑ No

Adaptive physical education _V.I.I._ ☑ Yes ☐ No
(If yes, indicate staffing ratio.)

Assistive technology device(s) ☐ Yes ☑ No

Assistive technology service(s) ☐ Yes ☑ No
(If assistive technology device(s) or service(s) are required, specify in management needs.)

## HEALTH/PHYSICAL MANAGEMENT NEEDS

(Environmental modifications, human/material resources or specialized equipment)

_None required_

Student    ROBERT RIOS                    NYC ID#   269-366-903      CSE #   11-33880      Date of Conference  _____

# ANNUAL GOALS AND SHORT-TERM OBJECTIVES

There will be _____ report(s) of progress per year.

### *ANNUAL GOAL*

ROBERT WILL IMPROVE HIS CALCULATION SKILLS

### *SHORT-TERM OBJECTIVES*

ROBERT WILL INCREASE HIS FUND OF NUMBER FACTS IN ADDITION, SUBTRACTION AND MULTIPLICATION WITH 90% ACCURACY.
ROBERT WILL COMPLETE 10 EXAMPLES WITH REGROUPING WITH 90% ACCURACY.
ROBERT WILL WORK ON MATH EXAMPLES IN A CAREFUL MANNER AND DECREASE HIS NUMBER OF CARELESS ERRORS WITH 90%
ACCURACY.

### *ANNUAL GOAL*

ROBERT WILL IMPROVE HIS APPLIED PROBLEM SKILLS

### *SHORT-TERM OBJECTIVES*

ROBERT WILL BE ABLE TO IDENTIFY ALL COINS AND THEIR EQUIVALENT AMOUNTS WITH 100% ACCURACY.
ROBERT WILL BE ABLE TO USE COIN AMOUNTS IN WORD PROBLEMS WITH 90% ACCURACY.
ROBERT WILL BE ABLE TO IDENTIFY THE CORRECT OPERATION AND SEQUENCE OF OPERATIONS NECESSARY TO COMPLETE APPLIED
WORD PROBLEMS WITH 80% ACCURACY.

### *ANNUAL GOAL*

ROBERT WILL IMPROVE HIS PHONOLOGICAL PROCESSING SKILLS

### *SHORT-TERM OBJECTIVES*

WHEN PRESENTED WITH 20 MULTI-SYLLABIC OR COMPOUND WORDS ROBERT WILL BE ABLE TO APPLY SYSTEMATIC SEGMENTING
SKILLS TO BREAK APART THE SOUND PARTS WITH 80% ACCURACY.
WHEN PRESENTED WITH 20 WORDS HE WILL BE ABLE TO APPLY DECODING SKILLS TO SEGMENT AND BLEND WORD PARTS WITH 80%
ACCURACY.
WHEN PRESENTE WITH 20 WORDS AT HIS FUNCTIONAL LEVEL ROBERT WILL BE ABLE TO IDENTIFY VOWEL SOUND AND RULE WITH
80% ACCURACY.

### *ANNUAL GOAL*

ROBERT WILL IMPROVE HIS READING COMPREHENSION SKILLS

### *SHORT-TERM OBJECTIVES*

WHEN PRESENTED WITH 5 STORIES AT HIS FUNCTIONAL LEVEL ROBERT WILL BE ABLE TO STATE THE SEQUENCE OF EVENTS WITH
90% ACCURACY.
WHEN PRESENTED WITH 5 STORIES AT HIS FUNCTIONAL LEVEL ROBERT WILL BE ABLE TO DRAW CONCLUSIONS BASED ON
INFORMATION FROM THE STORY WITH 80% ACCURACY.
WHEN PRESENTED WITH 5 STORIES AT HIS FUNCTIONAL LEVEL HE WILL BE ABLE TO STATE THE MAIN IDEA WITH 90% ACCURACY.
WHEN PRESENTED WITH 5 STORIES AT HIS FUNCTIONAL LEVEL ROBERT WILL BE ABLE TO APPLY READING COMPREHENSION
STRATEGIES INCLUDING RE-READING, SELF-QUESTIONING, SUMMARIZING AND PARAPHRASING WITH 70% ACCURACY.

Oct 7, 2005

Student  ROBERT RIOS          NYC ID# 268-366-903     CSE # 11-33880      Date of Conference

# ANNUAL GOALS AND SHORT-TERM OBJECTIVES (cont.)

There will be _____ report(s) of progress per year.

## ANNUAL GOAL

ROBERT WILL IMPROVE HIS EXPRESSIVE VOCABULARY

## SHORT-TERM OBJECTIVES

ROBERT WILL IDENTIFY THREE NEW WORDS FROM HIS READING AND USE THEM IN WRITTEN SENTENCES WITH 90% ACCURACY.
ROBERT WILL IDENTIFY A NEW WORD EACH WEEK FROM HIS EXPERIENCE AND USE THE NEW WORD IN A WRITTEN SENTENCE WITH 90% ACCURACY.
ROBERT WILL IDENTIFY 5 NEW WORDS FROM HIS AREA OF INTEREST AND PRESENT THESE WORDS AND THEIR MEANING TO THE CLASS WITH 90% ACCURACY.

## ANNUAL GOAL

ROBERT WILL IMPROVE HIS WRITTEN EXPRESSION SKILLS

## SHORT-TERM OBJECTIVES

ROBERT WILL WRITE 5 SENTENCES WITH CORRECT PUNCTUATION AND SPELLING WITH 90% ACCURACY.
ROBERT WILL WRITE 5 SENTENCES EACH WITH TWO DETAILS ON THE TOPIC PRESENTED WITH 80% ACCURACY
ROBERT WILL COMPOSE 2 PARAGRAPHS WITH TOPIC SENTENCE SUPPORTING DETAILS AND CONCLUDING SENTENCE WITH 90% ACCURACY.

Student _Robert Rios_    NYC ID# _268-366-903_ OSE # _11-33880_ Date of Compliance

## ANNUAL GOALS AND SHORT-TERM OBJECTIVES

There will be _____ reports of progress per year using the coding system shown below.

**ANNUAL GOAL:** _Robert will successfully_
_participate in the Adapted_
_Physical Education Program_

| PROGRESS: | 1st | 2nd | 3rd | 4th | 5th | 6th | 7th | 8th |
|---|---|---|---|---|---|---|---|---|
| Methods of Measurement | | | | | | | | |
| Report of Progress | | | | | | | | |
| Progress Toward Annual Goal | | | | | | | | |
| Reasons for not Meeting Annual Goal | | | | | | | | |

**SHORT-TERM OBJECTIVES:**

_Robert will be able to jump forward and perform test of gross Motor_
_Development Bord and step._
_Robert will be able to kick a ball open the 75MD 70% the time_
_Robert will be able to catch a ball w/a partner 70 70/70 with Accuracy_

**ANNUAL GOAL:**

| PROGRESS: | 1st | 2nd | 3rd | 4th | 5th | 6th | 7th | 8th |
|---|---|---|---|---|---|---|---|---|
| Methods of Measurement | | | | | | | | |
| Report of Progress | | | | | | | | |
| Progress Toward Annual Goal | | | | | | | | |
| Reasons for not Meeting Annual Goal | | | | | | | | |

**SHORT-TERM OBJECTIVES:**

### EXPLANATION OF CODING SYSTEM

**METHODS OF MEASUREMENT**
1. Teacher Made Materials
2. Standardized Tests
3. Checklists
4. Class Activities
5. Portfolios
6. Teacher/Provider Observations

8. Performance Assessment Task
7. Check List
7. Verbal Explanation
9. Other (Specify) _____

**REPORT OF PROGRESS**
1. Not applicable during this grading period
2. No progress made
3. Little progress made
4. Progress made; goal not yet met
5. Goal met

**PROGRESS TOWARD GOAL**
A. Anticipate meeting goal
B. Do not anticipate meeting goal
C. (Not (Ssssn))
C. Goal met

**REASONS FOR NOT MEETING GOAL**
1. More time needed
2. Excessive absence or lateness
3. Assignment not completed
4. Other (specify) _____

| | 1st | 2nd | 3rd | 4th | 5th | 6th | 7th | 8th |
|---|---|---|---|---|---|---|---|---|

The student's performance in approaching his/her promotion criteria as set forth on Page 8 of the IEP:

For students who are not anticipated to meet their annual goals and/or promotion criteria: We recommend that the IEP Team be reconvened:

_____

Page 6

95-4850R/JB.1 Rev. 2/01

10.7.05

Student ROBERT RIOS          NYC ID# 268-366-903          CSE #          Date of Conference

# ANNUAL GOALS AND SHORT-TERM OBJECTIVES

There will be _____ report(s) of progress per year.

**ANNUAL GOAL:**

ROBERT WILL DEMONSTRATE AN IMPROVEMENT IN LANGUAGE NECESSARY TO SPEAK AND LISTEN FOR INFORMATION, UNDERSTANDING, EXPRESSION AND SOCIAL INTERACTION

**SHORT-TERM OBJECTIVES:**

ROBERT WILL DEMONSTRATE THE ABILITY TO COMPREHEND AND USE PREPOSITIONS:  IN FRONT OF, BEHIND, BEFORE AND AFTER

CRITERIA: WITH 85% MASTERY

ROBERT WILL DEMONSTRATE AN UNDERSTANDING AND USE OF NOUNS, VERBS AND ADJECTIVES AT HIS INSTRUCTIONAL LEVEL

CRITERIA: WITH 70% MASTERY

ROBERT WILL DEMONSTRATE THE ABILITY TO COMPREHEND AND USE DEMONTRATIVE PRONOUNS (THIS, THAT, THOSE, THESE)

CRITERIA: WITH 70% MASTERY

CRITERIA: WITH 75% MASTERYROBERT WILL DEMONSTRATE THE ABILITY TO COMPREHEND AND EXPRESS CATEGORIZATION TECHNIQUES IN PRESENTED SUBJECT AREAS

CRITERIA: WITH 80% MASTERY

ROBERT WILL DEMONSTRATE THE ABILITY TO RETAIN AND FOLLOW THE SEQUENCE OF THREE OR MORE STEP DIRECTIONS PRESENTED ORALLY

CRITERIA: WITH 75% MASTERY

Student: Robert Leon

10.7.05

NYC ID# 268 366 903 CASE #

# ANNUAL GOALS AND SHORT-TERM OBJECTIVES

Date of Conference _____

There will be _____ reports of progress per year using the coding system shown below.

| ANNUAL GOAL: | PROGRESS: | 1st | 2nd | 3rd | 4th | 5th | 6th | 7th | 8th |
|---|---|---|---|---|---|---|---|---|---|
| Through Counseling, Robert will accept responsibility for completing homework/class work assignments. | Methods of Measurement | | | | | | | | |
| | Report of Progress | | | | | | | | |
| | Progress Toward Annual Goal | | | | | | | | |
| | Reasons for not Meeting Annual Goal | | | | | | | | |

SHORT-TERM OBJECTIVES:

Robert will turn in assignments as required by his teacher.

Robert will state his role when he does not complete assignments; responsibility for Robert his progress.

Robert will share in counseling his feeling about his progress.

| ANNUAL GOAL: | PROGRESS: | 1st | 2nd | 3rd | 4th | 5th | 6th | 7th | 8th |
|---|---|---|---|---|---|---|---|---|---|
| Through Counseling, Robert will improve self-image/self-confidence. | Methods of Measurement | | | | | | | | |
| | Report of Progress | | | | | | | | |
| | Progress Toward Annual Goal | | | | | | | | |
| | Reasons for not Meeting Annual Goal | | | | | | | | |

SHORT-TERM OBJECTIVES:

Robert will share 2 or more positive thoughts about himself at least once per week in Counseling.

Robert will share his accomplishments with group members.

Robert will identify evidence of the importance of projecting self-confidence.

## EXPLANATION OF CODING SYSTEM

**METHODS OF MEASUREMENT**
1. Teacher Made Materials
2. Standardized Tests
3. Checklists
4. Portfolios
5. Teacher/Provider Observations
6. Performance Assessment Task
7. Check list
8. Verbal Explanation
9. Other (specify) _____

**REPORT OF PROGRESS**
1. Not applicable during this grading period
2. No progress made
3. Little progress
4. Progress made; goal not yet met
5. Goal met

**PROGRESS TOWARD GOAL**
A. Anticipate meeting goal
B. May not be able to meeting goal
C. (Not reach)
D. Goal met

**REASONS FOR NOT MEETING GOAL**
1. More time needed
2. Goals are unclear or duplicate
3. Assignments not completed
4. Other (specify) _____

| | 1st | 2nd | 3rd | 4th | 5th | 6th | 7th | 8th |
|---|---|---|---|---|---|---|---|---|

The student's performance in approaching his/her promotion criteria as set forth on Page 9 of the IEP:

For students who are not anticipated to meet their annual goals and/or promotion criteria: We recommend that the IEP Team [is inconvenient]: _____

Page 8

*While a review of [your child's educational program occurs every year you have a right to request a review of your child's program at any time.]

Student _Robert Rios_

CSE # 11-33880

NYC ID# 268-366-903

Date of Conference _10-07-0_

# SCHOOL ENVIRONMENT AND SERVICE RECOMMENDATIONS

## GENERAL EDUCATION ENVIRONMENT

| Area of Instruction | Language(s) or Communication Mode | Periods per week | Supplementary Aids and Service | Program Modifications and Supports for School Personnel |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

## SPECIAL CLASS ENVIRONMENT

| Area of Instruction | Language(s) or Communication Mode | Periods per week | Special Class and Staffing Ratio | Supports | Reason for Non-Participation in General Education Environment |
|---|---|---|---|---|---|
| All | English | All | 12:1:1 | related services, counseling, speech + language | Due to deficits with oral language not commensurate with age and grade with delays beyond age appropriate ... requires a self-contained placement for access to management of the curriculum |
| | | | | | |
| | | | | | |

Student Robert Rios    CSE # 11-33880    NYC ID# 268-366-903    Date of Conference 10·7·05

# OTHER PROGRAMS/SERVICES CONSIDERED AND REASONS FOR REJECTION

Provide an explanation of the programs/services considered and the reason for rejection. Specify why the student can not achieve the goals of his/her IEP within a general education program with the assistance of supplementary aids and services.

General education with Special education teacher support services was considered and rejected as Robert has deficits in language processing, attention and focusing and math calculation (which necessitates more) support than is available in the environment.

A Special class in a Special school with a 12:1:1 ratio was considered and rejected as too restrictive a setting.

**Second Language Instruction:** If the student is exempt from second language instruction, explain why:

Student _Robert Rios_    NYC ID# _268-366-903_    CSE # _11-33880_    Date of Conference _Oct. 7 2005_

# PARTICIPATION IN SCHOOL ACTIVITIES, RELATED SERVICE RECOMMENDATIONS AND PARTICIPATION IN ASSESSMENTS

## PARTICIPATION IN SCHOOL ACTIVITIES

If the student cannot participate in lunch, assemblies, trips and/or other school activities with non-disabled students, indicate the activity and reason(s) for non-participation.

_Full Participation_

## RELATED SERVICE RECOMMENDATIONS

| Status* | Related Service | Language of Service | Location** | Sessions/ Week | Duration | Group Size |
|---------|-----------------|---------------------|------------|----------------|----------|------------|
| C | Counseling | English | Spanish | 1 | 30 | 3 |
| C | Speech Path/Language Path | English | Spanish | 2 | 30 | 3 |
| | | | | | | |
| | | | | | | |
| | | | | | | |

* Indicate status of recommendation: Initiate; Continue; Modify; or Terminate.    ** Indicate whether service is provided outside the general education classroom.

## PARTICIPATION IN ASSESSMENTS

☐ The student WILL PARTICIPATE in State and local assessments.
☐ Without Accommodations    ☑ With Accommodations
Describe accommodations, if any, that will be used consistently throughout the student's educational program:

_Extend time by one and a half_
_Directions will be reread_
_Question will be reread_

☐ The student will participate in Alternative Assessment.
Reason for participation in Alternative Assessment:

_____

In addition to Alternative Assessment, describe how the student will be assessed:

_____

## PROMOTION

Promotion    ☐ Standard Criteria    ☑ Modified Criteria*
*Describe the modified promotion criteria:
_Robert will meet standard promotional criteria with the following modifications_
_Robert will meet 70's of the third grade E.L.A. standards and 75% of the third grade math standards_
_as evaluated by classroom work, group and assessments_

Page 9
25-6500.09.6 (Rev. 3/01)

12

# EXHIBIT F

# EDUCATIONAL EVALUATION

Name: Robert Done
Date of birth: 9/6/95
OSIS: 268-366-903
CSE #: 11-33880

Date of Report: 9/26/02

Examiner:  M. Pappas
Exam type: Re-Eval
School:  PS 76
Grade: 2-435
Program: 12:1:1

REASON FOR REFERRAL:  Robert is a seven year old youngster who attends a second grade 12:1:1 class at PS 76.  He receives Speech and Language therapy as part of his educational program. Robert's mother requested this evaluation due to a lack of academic progress. This is a requested re-evaluation.

BACKGROUND INFORMATION: Robert attended the Rainbow Preschool and received Speech and Language services. He was reevaluated 12/99 as a result of aging out of preschool. Robert was classified Learning Disabled and placed in a MIS IV class with Speech and Language services.  A Type 3 Recommendation was requested 3/01 to add Counseling. Robert passed the school vision and hearing screening (9/23/02). Special alerts indicate that Robert has some allergies and takes medication as needed. He also has panic attacks and receives therapy at Astor Child Guidance Center. Robert's school attendance is fair/poor.
      The teacher reports that Robert relates better to peers than to adults.  The teacher rates Robert as Good in the areas of Making Friends. Willingness to share. Classroom duty. Group Participation. and Responsibility for homework. as Fair in the areas of Helping others. Self-reliance. and Completing an Activity, and as Poor in the areas of Listening Skills. and Attention span.  The teacher states that Robert is frequently withdrawn and shy. occasionally aggressive. and over-anxious. and has Fair Self Control. Academically. the teacher states that Robert is on the Kindergarten level in both Reading and Mathematics. She states that sometimes Robert reads well on a kindergarten level.  She reports that Robert understands spoken language quite well at times and at other times. totally ignores it. He talks very little to adults. but speaks often to his peers. Robert seems to have an adequate fund of general information. He remembers what he has learned short term. Sometimes he just refuses to work. His stubbornness. daydreaming and unfocused behavior inhibit his academic achievement.

READING CONTINUED: or any other vowel sounds. He was unable to combine known sounds.

The Spache Diagnostic Reading Scale was administered. Robert achieved a word recognition score on the 1.4 grade equivalent. However, he was unable to read a passage on that level.

A preprimer story was read to Robert. He was unable to answer any comprehension questions correctly.

MATHEMATICS: The Woodcock Johnson Revised (WJ-R) and the Brigance Inventory of Early Development were administered. On the WJ-R Broad Mathematics, Robert received a standard score of 45 and a percentile rank of 0.1. On the Applied Problems subtest, Robert received a standard score of 65, a K.2 grade equivalent and a percentile rank of 01. On the Calculation subtest, Robert received a standard score of 33, a K.0 grade equivalent and a percentile rank of 0.1. All scores place him in the Lower Extreme range of functioning.

Robert was able to count by rote to 39 (6.3 A.E.). He was able to demonstrate number concepts to 10. (6.3 A.E.). Robert was able to read numerals to 20. (6.3 A.E.). He was able to write numerals to 10. (6.3 A.E.). Robert was not able to tell time or identify any coins. He was able to add numbers to 5.

SUMMARY: Robert is a seven year old youngster who attends a second grade 12:1:1 class at PS 76. He receives Speech and Language therapy as part of his educational program. Robert's mother requested this evaluation due to a lack of academic progress. This is a requested re-evaluation.

The current assessment reveals Robert's academic skills range from the Lower Extreme to the Well Below Average range of functioning. Reading comprehension, Mathematics and Writing skills fall within the Lower Extreme range of functioning. Reading Decoding skills fall within the Well Below Average range of functioning. Robert is very fidgety and often needs refocusing. He is easily frustrated and guesses or gives up when he doesn't know the answer. Final recommendation awaits a team conference.

*Midge Pappas*

Midge Pappas
Education Evaluator

2

# EXHIBIT G

Comprehensive Psychoeducational Evaluation

Name of Student: Robert Rios
Date of Birth: 9/6/1995
School/Grade: PS96/Fifth Grade
Program: Special Class 12:1:1
Identification #: 268366903
CSE #: 11-33880
DATE OF EVALUATION: 9/19/05

Tests Administered: Clinical Interview, Review of Records, Consultation with Teacher, Wechsler Scale-Wechsler Abbreviated Scales of Intelligence, Woodcock Johnson Tests of Achievement-Third Edition, Writing Sample, Figure Drawing, Sentence Completion

Reason for Referral: This is a triennial evaluation of Robert Rios who currently attends a special class and receives counseling and speech and language as related services. He is classified speech and language impaired.

Background: According to the social history update of September 19, 2005 Robert is described by his mother as a cooperative and helpful youngster who is close to his older sister. Ms. Rodriguez feels he has made progress in his present program but still needs more help with reading and with his confidence. His mother did state that Robert has health issues including asthma and food allergies, which caused a number of absences. His teacher describes him as a youngster who tends to give up easily and can be dependent on others. He gets along with his peers and is respectful towards adults. His decoding skills have improved and the teacher estimates reading skills at mid third grade level with math skills more delayed.

Behavioral Observations: Robert, a slender slight appropriately groomed youngster, easily accompanied this examiner. He related in a shy somewhat withdrawn manner and spoke in such a low tone that it was difficult to hear him unless you continually asked him to speak up. Informal expressive language appeared somewhat delayed as he spoke in unelaborated sentences and often had to be encouraged to add detail to his responses. A language sample indicated delays in both semantics (vocabulary) and syntax as well as word retrieval difficulties. Robert was unable to recall either his address or telephone number. He did describe his family as consisting of his mother, father and three sisters, two of whom are in Puerto Rico. He reported that he has most trouble with math and he enjoys free time, playing outside and reading. Robert would like to be a veterinarian when he grows up. He did mention that he has allergies and asthma and uses the pump when it is required. Robert also mentioned that he often has headaches.

Work habits during the assessment were problematic as Robert worked very slowly, was hesitant when initiating tasks and needed a great deal of encouragement and reassurance to persist at his work. In addition he had some difficulties picking up on salient details of problems or tasks (which details are important). Robert often became "stuck" on a problem and had to be guided to move along. He often spent unproductive time reworking tasks and could not judge how long to work at a various items. However he

always attempted to complete the items presented and seemed to enjoy the individual attention that a testing situation affords.

Cognitive Functioning: Robert was administered the Wechsler Abbreviated Scales of Intelligence to obtain a measure of reasoning in both verbal and perceptual areas of functioning. Following are test results:

| Verbal Subtests | T Scores (50=average) |
|---|---|
| Vocabulary | 39 |
| Similarities | 37 |

| Performance Subtests | T Scores (50=average) |
|---|---|
| Block Design | 42 |
| Matrix Reasoning | 42 |

Robert received a verbal score of 82 (12th percentile, borderline range), a performance score of 86 (18th percentile, low average range) and a full scale score of 83 which places overall intellectual functioning in the low average range.

Verbal reasoning skills including his ability to form concepts, generalize from particulars and see similarities in events or objects were assessed at low average range. Vocabulary knowledge was relatively strong suggesting potentially stronger expressive speech. Perceptual reasoning abilities are also close to age expectancy.

Social and Emotional Functioning: Robert is a friendly youngster who is tends to be shy and a bit withdrawn. Difficulties with self esteem and feelings of inadequacy impact on functioning. He is a youngster who is fearful of making errors and receiving criticisms. He needs a great deal of reassurance to take chances due to underlying feelings of vulnerability and insecurity. Robert needs to develop feelings of mastery and responsibility. Social skills seem to be developing adequately.

Educational Functioning: Robert was administered selective subtests of the Woodcock Johnson Test of Achievement-Third Edition. Following are test results:

Letter-Word Identification: This subtest requires the youngsters to read increasing difficult words in isolation and measures sight word vocabulary as well as decoding and word attack skills. Robert has made strides in this area and has a substantial sight word vocabulary. Decoding skills are developing although he needs more support in structural analysis and with dipthongs and digraphs. He received a grade score of 3.3 in this area.

Reading Fluency: On this subtest the student is required to read simple sentences and decide whether they are true or false. It is a measure of reading speed and accuracy. Reading fluency is an important measure of a youngster's ability to understand what he reads and keep up in class. He received a grade score of 2.4 on this subtest. Robert tends to process information slowly and he has trouble with sustaining his performance.

2

Story Recall: On this subtest the youngster hears a series of stories and he must repeat the story and story details. This is a measure of auditory recall and auditory attention. It is reflective of a student's ability to retain oral information. Robert received a grade score of 2.1 on this subtest. He is a student who would do best with information presented in more that the oral modality (ie, directions written and administered orally as well as instructions repeated).

Spelling: On the spelling subtest the student is required to spell words in the student record booklet that is presented to him orally. Skills required on this task include auditory attention, encoding and decoding skills as well as phonemic awareness. Robert did fairly well on this subtest and received a grade score of 3.1.

Passage Comprehension: This subtest requires the student to supply a missing word in a passage that he reads. It requires phonological processing, comprehension skills, vocabulary knowledge and ability to form inferences. Robert did fairly well on this task and would have done better but he made many decoding errors and lost the meaning of what he was reading (for example he read last for least, proud instead of produces). He was able to read in a smooth fluent style. Robert received a grade score of 3.7 on this subtest.

Mathematics:

Calculation: The youngster is presented with traditional math problems which he has to solve in his record booklet. Robert worked on these problems in a careless uninvolved manner, skipping many questions. He is able to do simple addition and subtraction but did make careless errors which had a negative impact on his score ( for example 9+7=17, 5x3=20). He was unable to complete examples that required regrouping. Robert received a grade score of 2.4. Robert needs to memorize his number facts and review the concept of regrouping.

Applied Problems: This subtest measures practical math knowledge, such as working with money and measurement, as well as working with word problems. Robert had a great deal or difficulty with this task. He does not know all his coin amounts, nor was he able to apply the correct operation to word problems. He received a grade score of 1.6 on this subtest.

Oral Language:

Picture Vocabulary: This subtest measures expressive vocabulary knowledge and is dependent on a youngster's level of experience and general knowledge base. Robert did poorly on this subtest receiving a grade level of K.3.

Oral Comprehension: On this subtest the student supplies the missing word to a short passage or sentence. It requires inferential reasoning, vocabulary knowledge and auditory comprehension skills. Robert has weaknesses in oral reasoning and received a grade score of 1.2 on this subtest.

3

Summary: Robert Rios a 10 year old student who is classified speech and language impaired is currently in a special class with a 12:1:1 ratio and receives counseling and speech and language as related services. This evaluation is part of a comprehensive triennial review. Robert is a shy youngster, who spoke in a very low volume and whose work habits are problematic as he tends to give up easily, works slowly and has difficulty picking up on salient details in problems and tasks. Robert has made significant progress in all aspects of reading including decoding and comprehension. He is functioning at third grade levels in these areas. Math skills are weaker than reading skills. Oral language and auditory comprehension are both below expectancies. Robert is a friendly youngster who gets along with peers. However problems with feelings of inadequacy and lack of confidence affect his school functioning. Robert needs to develop better work habits and increase his motivation for academics. He needs to review math facts and regrouping and requires material presented visually as well as orally. Robert requires extra time because of his slow working style and help in picking out salient details of problems. He needs encouragement and reassurance to help him persist at tasks.

Final recommendations await the multi-disciplinary planning conference.

Michele Zaretsky

School Psychologist

4